Julia M. O'ROURKE, Plaintiff, Appellee,

v.

CITY OF PROVIDENCE, Defendant, Appellant.

Nos. 99–2346, 00–1008.

United States Court of Appeals, First Circuit.

Heard Oct. 2, 2000.

Decided Jan. 8, 2001.

Kevin F. McHugh, Assistant City Solicitor, for appellant.

Gerald C. DeMaria, with whom James A. Ruggieri, Higgins, Cavanagh & Cooney, and Patricia E. Andrews were on brief, for appellee.

Before TORRUELLA, Chief Judge, LYNCH and LIPEZ, Circuit Judges.

LYNCH, Circuit Judge.

Two different juries have now found the Providence Fire Department liable under Title VII to one of its first women firefighters, Julia O'Rourke, for that form of sex discrimination known as sexual harassment. O'Rourke asks us to reinstate the first verdict for $275,000. The City defends the trial court's decision to vacate that verdict and order a new trial but complains that the second verdict, for $200,000, based on evidence over a shorter period of time, is unsound.

We conclude that the trial court erred when it vacated the first verdict on the grounds that evidence from before the charge period had been erroneously admitted. The evidence was properly admitted to prove a continuing violation and it would have been error to exclude it. We reinstate the original verdict and remand for recalculation of the attorneys' fees due plaintiff for the two trials. In particular, this opinion:

1) clarifies the continuing violation doctrine as to serial violations;

2) discusses the interplay between that doctrine and the law of sexual harassment;

3) applies recent Supreme Court case law in hostile work environment cases as to the standard for employer liability for (i) co-worker conduct and (ii) supervisor conduct; and

4) analyzes whether the damages award based largely on emotional distress and psychological harm is excessive.

## I.

We summarize the evidence at trial in the light most favorable to O'Rourke. *See Andrade v. Jamestown Hous. Auth.*, 82 F.3d 1179, 1186 (1st Cir.1996).[1]

Until 1990, no female firefighters had ever served in the City of Providence Fire Department. In January, 1992, O'Rourke and six other women who had passed a written examination were admitted to the City's firefighter six-month training program, along with 77 male trainees. O'Rourke was hired under the City's newly implemented affirmative action policy.

The structure of authority in the fire department starts with the Commissioner of Public Safety, followed by the Chief of the Department. Next is an Assistant Chief of the Department and a Deputy Assistant Chief, followed by several Battalion Chiefs, Captains, and Lieutenants. Each of the fourteen stations (called "Engines") is headed by a captain, who oversees the station's several groups, each of which is headed by a lieutenant or by the station captain. That is the overall management command structure. There were no women in the command structure directly over O'Rourke at any time in question. Further, O'Rourke had no women co-workers in her group when she was assigned to the various Engine companies.

1. In order to review the district court's rulings that are the subjects of this appeal, our fact summary is based on testimony at the first trial. The second trial excluded evidence of acts occurring before May, 1994.

She was the first and the lone woman wherever she worked in the Department.

In January of 1992, the Department Chief promulgated a sexual harassment policy. The policy prohibited firefighters from keeping sexually explicit books and magazines, viewing sexually explicit movies, or making sexual jokes at their respective stations. The superior officer at each station was responsible for enforcing the policy, and they had been trained to do so. New firefighters were to be instructed during two hours of sensitivity training, including a component on sexual harassment, to be incorporated into the curriculum of their six-month training program.

O'Rourke underwent this six-month training program. During this period and often in the presence of supervisors, overtly sexual behavior was directed toward O'Rourke. For example, during a class break, a male trainee, Ferro, passed around a video camera playing scenes of Ferro having sex with his girlfriend. The instructor was in the classroom and did nothing. Ferro also discussed his sexual prowess, endurance, penis size, and his sexual encounters during lunch breaks, just outside the training facility. These incidents occurred in the presence of officers.

O'Rourke expressed her disgust and discomfort directly to Ferro, but Ferro was undeterred. During a training exercise in a pool and in the presence of an officer of the academy, Ferro pointed to O'Rourke's breasts and commented that she was "stacked." Ferro constantly discussed sexual positions and oral sex. O'Rourke "just blocked them out." While standing in line for roll call, which was conducted by various academy officers, Ferro, standing behind O'Rourke, would frequently expound his opinion that women are pigs.

Ferro's behavior was not unique. Another male trainee, McDonald, snapped O'Rourke's bra, commented on her scent, and asked O'Rourke if another female trainee, whom McDonald called a "dyke," ever looked at O'Rourke while they were changing clothes. McDonald also asked O'Rourke, in the presence of several other firefighters, if she was on birth control. He said he wanted to know so that they could all "bang" her at a union party that night. Common conversation was whether firefighters had gotten "banged" over the weekend. Some of these incidents occurred in the presence of training academy officers. The commentary made O'Rourke so uncomfortable that she began trying to camouflage her body by wearing oversized shirts. She did not complain to any of the officers because she "didn't want to cause any waves" and "just wanted to get through the academy."

After completing the training program, O'Rourke accepted a temporary assignment in the office of the Fire Department Chief, Chief Bertoncini. She worked for Chief Bertoncini from June to September, 1992, and after a brief layoff, from November, 1992, until March, 1993. She performed administrative tasks under the instruction of two women who worked directly for the Chief. In O'Rourke's presence, the Chief sat on the lap of his preferred secretary with his arm around her shoulder, and referred to the other secretary (who was not present) as a "stupid fat bitch" and commented on her breast size.

During that time, McCollough, another firefighter working near O'Rourke, blew in her ear, rubbed his cheek against hers, and stood over her with their bodies squarely touching as she made copies. He also asked her out on dates at least twelve times, all of which O'Rourke declined. O'Rourke did not complain to Chief Bertoncini at the time for fear of being labeled a whiner.

Also while at Chief Bertoncini's office, O'Rourke encountered her former fellow trainee Ferro, who continued to discuss his sexual encounters in front of her and urged O'Rourke to "have" him, promising that if she did, she would never want another man. These comments often were

made in the presence of officers. O'Rourke felt distinctly uncomfortable around Ferro.

Chief Johnson, the superintendent of the carpentry shop located in the Fire Prevention Bureau, told O'Rourke that McDonald (the one who had snapped O'Rourke's bra during training) talked about her a lot and was crazy about her. O'Rourke made it clear to Chief Johnson that she was not interested.

In March of 1993, O'Rourke was assigned to Engine 5, Group B. The Engine company consisted of four groups, each with an officer in charge, one of whom also served as captain of the house. O'Rourke was the only female firefighter at Engine 5. The company living quarters consisted of a common bathroom, kitchen, and sitting room; each firefighter had a private bedroom. A typical shift involved two days and two nights on, four days off. O'Rourke saw stacks of pornographic magazines in the common sitting room and bathroom, which sometimes were open to a page displaying pictures of naked men and women engaged in sexual acts. O'Rourke saw male firefighters reading the magazines, which made her "very uncomfortable." The officers knew the magazines were there and did nothing. This inaction clearly violated the harassment policy. O'Rourke, however, did not complain.

In the summer of 1993, Lieutenant Young, who was acting head of O'Rourke's group, suggested that the group take a patrol ride through their district in a fire truck. Lieutenant Young offered the other firefighters beer, which O'Rourke declined. While they were driving through a part of the district that was known as a popular hangout for men, Lieutenant Young wrote O'Rourke's name and the station phone number on pieces of paper and threw them out the window to the men on the street below. O'Rourke asked him to stop, but Lieutenant Young laughed and continued.

In the fall of 1993, O'Rourke injured her hand and was out for four or five months, but continued to go to the station weekly to pick up her paycheck. During one such visit, O'Rourke encountered her commanding officer, Lieutenant Cionfolo. Lieutenant Cionfolo asked O'Rourke how she met her boyfriend. Then, referring to one of the women in Chief Bertoncini's office, he told O'Rourke "you're just a virgin and [the woman] lies flat on her back."

Also during this time, a chief officer told O'Rourke's brother Coley, also a City of Providence firefighter, to warn her that there was a closed circuit television hidden in her bedroom at Engine 5. O'Rourke, scheduled to return to work the next week, called her commanding officer, Lieutenant Cionfolo, and asked him to investigate the rumor. She asked him not to tell anyone or "make a big thing out of it if it was just a rumor." Lieutenant Cionfolo arranged for O'Rourke to meet him at the station the next day to investigate and he promised not to tell anyone. When she arrived, Lieutenant Cionfolo, in the presence of two other firefighters in the group, told her "we didn't find the video camera." O'Rourke accompanied Lieutenant Cionfolo to her room, which was being used by a male firefighter while O'Rourke was not there. She noticed a poster of a semi-nude woman on the wall; when she objected to Lieutenant Cionfolo, he removed it. O'Rourke was unsure whether there was a camera in her room, especially since a chief officer had warned her. She wore pants to bed, had difficulty falling asleep, and was afraid to change in her room because she felt "like I was being invaded of my privacy when I was in that room."

Shortly after returning to work, while at another station, O'Rourke was sitting with several male firefighters. The men were in regular uniform but without their outer jackets on, which were to be worn outside. O'Rourke's jacket was on the back of her chair. Station Chief Costa entered the room and asked O'Rourke if the jacket was hers, then told her "you put that jacket on and you keep it on." None of the male

firefighters were told to wear their outer jackets.

Another firefighter at Engine 5, Isom, left a note on O'Rourke's bed asking her out on a date. O'Rourke discovered it upon returning from a call at 2:00 A.M. O'Rourke was concerned that Isom had been in her room late at night while she wasn't there. She took the note to the officer in charge, Lieutenant Dunne, and asked him to talk to Isom about it and tell him that she was not interested in dating him. Dunne spoke to Isom, but, a few days later, Isom verbally asked O'Rourke on a date. O'Rourke declined and again spoke to Dunne, who told her he would take care of it.

After the incident, O'Rourke avoided Isom; she was plagued by worries that she might "have to work with him somewhere else at another station in a dormitory where he might be sleeping next to me." In general, O'Rourke "felt awkward all the time" to be working with men whom she knew wanted to go out with her:

> I tried to be nice to them as much as possible. They're my co-workers, but also in the back of my mind is that I also have to go to a fire with them, and I'm inexperienced, and I want to know that these people . . . are not going to stand there and let me fall flat on my face.

O'Rourke started becoming anxious when she had to go to work and had trouble sleeping when she was at the station overnight.

O'Rourke once had an accident backing the fire truck into the station; she hit the wall of the station and damaged a ladder. Department procedure required drivers to have spotters while backing into the station, but none were available at the time. When Chief Costa investigated, he was told that there had not been spotters available. He told O'Rourke that she was going to have to "take the heat for this" and say that there were spotters present, an untruth. O'Rourke complied. After a hearing before the accident review board, O'Rourke was put on probation for six months.

In April, 1994, O'Rourke fought her first major fire. That event would ultimately lead to her transfer to Engine 13, a different station. Some standard procedures were not followed during the fire: Lieutenant Cionfolo did not give O'Rourke instructions or follow protocol in engaging Engine 5's line, which he handed to a member of a different fire company instead of O'Rourke; O'Rourke left the fire floor to get a new air tank after hers ran out, and she assisted a rescue company with a fire victim before returning to her position on the fire floor. O'Rourke left her position on the line after an alarm went off indicating that she had only 5 minutes remaining in her air pack. On her way to get a new pack, she encountered Chief Costa, the district battalion chief in charge of her station, in the stairwell. Chief Costa ordered O'Rourke to "get the fuck back up those stairs." O'Rourke obeyed the order, but ultimately ran out of air and returned to Engine 5 to retrieve a new tank. After the fire was out, Chief Costa walked past O'Rourke and asked, "Why did you leave your company?" but did not give O'Rourke a chance to respond. O'Rourke had seen many mistakes by others at the fire and felt singled out by Chief Costa's comment. She told Lieutenant Cionfolo about the incident, who told her not to worry about it.

Four days after the fire, Lieutenant Cionfolo informed O'Rourke that she was to attend a meeting with him, Chief Costa, and Dave Curry, a union representative, to discuss her performance at the fire. No other firefighters in O'Rourke's group were required to attend similar meetings, and Lieutenant Cionfolo told her that she was the "biggest problem" at the fire. Chief Costa asked O'Rourke to account for her actions during the fire. When O'Rourke described the incident where Chief Costa had ordered her back upstairs after her air tank alarm went off, Costa interrupted her, saying repeatedly, "I

didn't tell you to get back up those stairs. I told you to get the *fuck* back up those stairs." Chief Costa said to O'Rourke, "You know, I'm not doing this because you're a woman;" O'Rourke responded, "You must have [a] problem with it because you keep bringing it up that I'm a woman." Chief Costa replied, "This is how you get your reputation." O'Rourke recounted the events of the fire several times over the course of approximately two hours; Chief Costa and Lieutenant Cionfolo told her that their records did not match what she was telling them. When Chief Costa asked O'Rourke why she did not have a line, she told him that Lieutenant Cionfolo had given it to a member of another company, a violation of protocol. They also confronted O'Rourke about a rumor that she was seeking to transfer out of the company and asked her if she wanted to go to fire prevention; O'Rourke replied that she wanted to remain a firefighter and that she "didn't come on this job to sit up in an office." Chief Costa ended the meeting by asking O'Rourke and Lieutenant Cionfolo whether they could continue working together—O'Rourke replied that she could, but Cionfolo did not reply. The union representative, Curry, opined that the problem was just a personality conflict. Chief Costa directed O'Rourke and Lieutenant Cionfolo to meet to work things out, and to report the results to him the next day.

The next day, O'Rourke met with Lieutenant Cionfolo. He accused her of having "sold him down the river" by telling Chief Costa that he gave up his line at the fire. He repeated the rumor about O'Rourke wanting to transfer; O'Rourke admitted that she was interested in going to a company that was more committed to doing drills and maintaining preparedness. Lieutenant Cionfolo told her to get out of his station and that she was off his group. He took O'Rourke's gear off of the truck and told her to report to a different station. He called Chief Costa in O'Rourke's

presence and told him she was "rude, disrespectful, and didn't know what the Christ [she] was doing." O'Rourke was summoned to another meeting with Chief Costa, where she was asked to sign a transfer form on which Lieutenant Cionfolo had written that they had "reached an impasse that will affect our working together" and that it was "in the best interest of the department and Engine Company 5" that O'Rourke be transferred; O'Rourke did not agree to the transfer but understood that she had no choice.

O'Rourke submitted a form to Department Chief Bertoncini describing her version of the events during the fire and requesting a meeting with him, but was told by Chief Bertoncini's secretary that the chief would not respond. When O'Rourke met with the union vice-president, George Farrell, to file a grievance with the union about her transfer, he discouraged O'Rourke from filing a grievance, telling her "you don't want to do that, do you," so she did not. After a temporary detail, she was transferred permanently to Engine 13.

O'Rourke arrived at Engine 13 on May 8, 1994, and met with the officer in charge that day, Lieutenant Gonsalves, as well as the other firefighters in her group, all male.[2] At the meeting, they asked O'Rourke whether she minded that they slept in their underwear; the sleeping quarters at Engine 13 consisted of one room of beds, without partitions. O'Rourke did not object. The showers and bathrooms were not private. O'Rourke slept in her full uniform and did not use the showers. Lieutenant Gonsalves and other firefighters asked her about the fire, stating that they heard she had "bailed out." The captain of the station, Captain Hiter, who also headed O'Rourke's group, informed O'Rourke that she came to Engine 13 with a "black cloud," a bad reputation because she had bailed out of the fire. Before O'Rourke arrived, Captain Hiter told her brother

---

**2.** There was one other woman at Engine 13, but she was part of a different group.

Vincent, also a Providence firefighter, that the group was not happy about her coming to work there, and that Captain Hiter himself had a problem working with a woman.

O'Rourke asked Captain Hiter for a locker to store personal belongings, including personal hygiene items. He told her none were available and that lockers were issued by seniority; O'Rourke was the least senior in her group. Others in her group had lockers issued by the City. O'Rourke brought in her own.

On her first day, O'Rourke found pornographic magazines in the drawers of the kitchen and sitting area. She did not say anything because "it was accepted ... it was everywhere" and because she "just got shacked out of Engine 5 to Engine 13" and did not want to begin her stay at Engine 13 on a bad note. On about three occasions, O'Rourke witnessed the male firefighters in her group watching pornographic movies in the common sitting area. O'Rourke had to pass through the area in order to access the kitchen. Captain Hiter knew that these materials were in the station and that the City's sexual harassment policy prohibited them, but did nothing.

Shortly after O'Rourke arrived, Lieutenant Gonsalves told O'Rourke that he and the other firefighters in her group were trying to find a way to have O'Rourke put on detail out of Engine 13 on July 4 because they wanted to light off fireworks and did not want O'Rourke there. Lieutenant Gonsalves also told O'Rourke, "We didn't take you over here lying down. We don't want you here. You were just transferred over here." Captain Hiter confirmed that O'Rourke was to take a detail on July 4, even though it was not her turn, because the male firefighters wanted to celebrate together as a group. O'Rourke was upset because the group was supposed to make decisions collectively about who took details, without the Captain's influence, and because she was "supposed to be a part of that company now" but was

obviously unwanted. Nonetheless, she did as she was instructed.

On another occasion, returning from a call, O'Rourke and her group passed Cheaters, a topless bar. Lieutenant Gonsalves, who was the officer in charge at the time, commented that "our sister has a VIP pass to get us into Cheaters." O'Rourke was embarrassed but did not say anything because she wanted to be "as nice as possible to these guys" and "want[ed] them to accept me."

Within a month of her arrival at Engine 13, O'Rourke and Captain Hiter began meeting to discuss various issues, including complaints about O'Rourke by the other firefighters in her group that O'Rourke was "trying to get away with things" when Captain Hiter was not there. Captain Hiter asked O'Rourke about whether her locker was city property because other, more senior firefighters in the company complained that she was not entitled to a locker; it was later determined that the locker was not city property, and O'Rourke was allowed to keep it.

By September, O'Rourke noticed that the male firefighters frequently met behind closed doors in Captain Hiter's office without inviting her in; these meetings occurred daily, with or without Captain Hiter, but always excluding O'Rourke. O'Rourke asked Captain Hiter what was motivating the exclusionary meetings and why they never talked as a group, but Captain Hiter did not respond.

O'Rourke's ostracism intensified. On one call, when O'Rourke was driving, she asked Lieutenant Gonsalves for directions, as she was new to the district and did not know her way around; other firefighters routinely helped each other with directions while driving. Lieutenant Gonsalves responded, "I'm not the fucking chauffeur, you are." When O'Rourke approached her colleagues after a fire, they all walked away from her. One of the chiefs from another station referred to O'Rourke as the "Maytag man" because she was always

alone. If O'Rourke rode in the back of the fire truck, the firefighters in the cab closed the window so that she could not hear what was being said. When the group met after a fire to debrief, they ignored O'Rourke's questions about her performance and rolled their eyes.

Other incidents contributed to the hostile environment. One firefighter kept pictures of nude women in his locker, which O'Rourke saw; she described the effect of seeing those pictures:

> I see these pictures of these women there, and is this what they think of women? Is this how they're viewing me? There was no respect.

Another discussed oral sex and asked O'Rourke if she knew whether a particular firefighter's girlfriend "swallowed deep." Male firefighters frequently referred to women as "cunts" or "pussies."

O'Rourke's car was damaged, and she suspected it was vandalized by one of her co-workers. In addition, her locker was glued shut. Lieutenant Gonsalves and other firefighters in her group frequently referred to food O'Rourke was eating as "lesbian food."

The ostracism took its toll on O'Rourke. In addition to gaining a significant amount of weight, she had difficulty sleeping because she was "up all night agonizing about going to work." She became exhausted and was a "nervous wreck."

The atmosphere at Engine 13 continued to deteriorate. In September 1994, O'Rourke once again was assigned to a detail when it was not her turn, as she had been on July 4. When she attempted to check the station's records to confirm whose turn it was, Lieutenant Gonsalves simply repeated that she had to take the detail. Lieutenant Gonsalves made a comment to O'Rourke's brother—in-law, DiSilva (another firefighter), that O'Rourke "just got nothing but big tits." Someone hung a poster in the dormitory of a semi-nude woman in a provocative pose, entitled "Miss Julie Stratton," but with the last name crossed out so that it read "Miss Julie." O'Rourke, whose first name is Julia, understood this to be a reference to her. O'Rourke's brother Vincent removed the poster. Vincent also found mail taped to O'Rourke's locker that was addressed, "firefighter Julia AWOL."

Also at that time, O'Rourke's brothers Vincent and Coley came to Engine 13 to confront the male firefighters about their treatment of O'Rourke. Coley had discussed his concerns with Chief Johnson on several occasions, and Chief Johnson finally suggested that Coley should go talk to the members of Engine 13 and "try to straighten the situation out." The brothers had a heated exchange with Lieutenant Gonsalves and Captain Hiter; as a result of that incident, O'Rourke's brothers were disciplined.

After that, O'Rourke's brother-in-law DiSilva met with Chief Cotter to discuss his concerns about the male firefighters' treatment of O'Rourke in general and told Chief Cotter about Lieutenant Gonsalves' comment that O'Rourke had "nothing but big tits." At Chief Cotter's request, DiSilva submitted a written complaint to the Department Chief. No one from the Chief's office contacted DiSilva about his complaint.

On September 18, 1994, shortly after the incident involving her brothers, O'Rourke decided to seek help from the City's EEO officer, Gwen Andrade. She did not follow the chain of command by complaining to Captain Hiter because he knew what was happening at Engine 13 but had done nothing about it. O'Rourke met with Andrade, along with a union representative, Stephen Day, a union attorney (whose presence O'Rourke did not request), and O'Rourke's brother-in-law DiSilva. O'Rourke showed them the altered poster but got no response. They laughed when O'Rourke told them about the "lesbian food" comments. Union representative Day told O'Rourke the meeting was limited to discussing Engine 13 conduct only, although O'Rourke wanted to discuss the

earlier incidents. EEO Officer Andrade did not ask any questions during the meeting. Andrade concluded that O'Rourke's complaints were related to "social issues," not "work issues," and ended the meeting by telling O'Rourke to come up with solutions. O'Rourke then retained her own attorney.

After O'Rourke's meeting with Andrade, O'Rourke's group continued to exclude her, spending time in Captain Hiter's office with the door closed. Because O'Rourke was excluded from group discussions about upcoming drills, she would be the only member of her group who was unprepared when it was time to perform the drills. During one such drill, one of the firefighters screamed at O'Rourke in front of others for not being prepared.

O'Rourke still attempted to discuss her concerns with Captain Hiter, but he did nothing. She began receiving crank phone calls at home and at the station, with the caller whining or making crude noises. She was a "nervous wreck" while at work and sometimes felt her body shake uncontrollably. While responding to a call, O'Rourke took a wrong turn and had an accident while trying to turn around. That incident was the breaking point. O'Rourke felt she was no longer able to function and left work on injured-on-duty status in December, 1994. She began seeing a psychiatrist, with whom she continues treatment. When O'Rourke went to the station to retrieve her belongings, she discovered pornographic mail belonging to a fellow firefighter had been placed in her locker.

In January of 1995, O'Rourke, with her attorney, met with Chiefs Bennett and Cotter, as well as the city attorney, to discuss O'Rourke's complaint. The two chiefs were assigned to investigate O'Rourke's allegations. O'Rourke had prepared an outline and discussed many of the incidents that had occurred at both Engine 5 and Engine 13, and answered the chiefs' questions. She emphasized that she was eager to have the matter resolved and return to work, and asked the chiefs to tell her if she was doing something wrong. At the end of the meeting, O'Rourke was told that she would be contacted when their investigation was completed. The two chiefs scheduled no further meetings with her.

Approximately one month after the meeting, O'Rourke called Chief Bennett to discuss the status of the investigation. Chief Bennett told her that he was unable to proceed with the investigation because "they're refusing to speak ... there's no use." Chief Bennett also told O'Rourke that there was a gag order put out prohibiting him from speaking to firefighters, lieutenants, and captains—anyone lower than a chief. The new chief of the Department, Chief DiMascolo, had told Bennett and Cotter that the union did not want its members involved in the investigation, and Chief DiMascolo declined to take any action to encourage their participation. Frustrated, Chief Bennett and Chief Cotter withdrew from the investigation in February, 1995. Shortly thereafter O'Rourke filed her administrative charge of discrimination.

O'Rourke remained out of work for over two years. As a result of the stress she experienced, O'Rourke gained a total of 80 pounds. She was anxious and afraid to leave the house, and was particularly anxious about encountering Providence firefighters.

O'Rourke returned to work at the fire department in 1997. Following her psychiatrist's advice she no longer works as a line firefighter but instead joined fire prevention, where she remains today.

## II.

On July 10, 1995, O'Rourke filed a discrimination charge with the Rhode Island Commission of Human Rights and with the U.S. Equal Employment Opportunity Commission and received notice of right to sue. O'Rourke also filed a federal court complaint against the City on June

30, 1995, and an amended complaint on July 17, 1995, also naming four firefighters as individual defendants.[3] The complaint included claims of disparate impact and sex discrimination under Title VII and Rhode Island law, as well as § 1983 claims.

A jury trial began July 14, 1997. Defendants filed a motion in limine to exclude all evidence of harassment occurring before O'Rourke's tenure at Engine 13 on the grounds that those acts were outside Title VII's 300–day limitations period and that such evidence was unduly prejudicial and should be excluded pursuant to Fed. R.Evid. 403. O'Rourke invoked the continuing violation doctrine, alleging that there were acts occurring before and during the 300–day period, and arguing that the evidence was not unduly prejudicial under Rule 403 but relevant to proving that theory. The court denied defendants' motion.

O'Rourke introduced evidence of harassment spanning the entire duration of her employment at the fire department from 1992 to 1994—including her time spent in training in 1992, the period in which she worked in the Chief's office later that year, her year-long stay at Engine 5 in 1993, and finally, her seven months at Engine 13 in 1994. At the close of O'Rourke's case, defendants moved for judgment as a matter of law. The court granted the motion as to the § 1983 counts against the City and individual defendants on the ground that there was no evidence that the City of Providence or the individual defendants had intentionally discriminated against O'Rourke. O'Rourke does not appeal this decision. The court also dismissed O'Rourke's Title VII disparate impact claims as duplicative of her hostile work environment sexual harassment claim. That reasoning is legally doubtful, but O'Rourke does not appeal this decision

either, and so, for purposes of this opinion, we take the hostile work environment claims as encompassing any disparate impact claims.

The court also ruled that "[t]he statute of limitation clearly applies in this case, and limits the plaintiff's claims to September 13, 1994, forward for sexual harassment." When O'Rourke argued that the earlier evidence was relevant to show a continuing violation, the court responded: "I allowed that evidence in to show a pattern, but it doesn't have anything to do with the claim that took place at Engine 13. The whole gist of your case is what happened at Engine 13." The court also noted O'Rourke's failure to complain about her treatment before September, 1994. Counting back 300 days from when O'Rourke filed her complaint with the EEOC on July 10, 1995, the court found O'Rourke's claim was limited to the incidents occurring at Engine 13 since September 13, 1994. Because the state limitations period was 360 days, and for the sake of simplicity, the court decided that evidence from May, 1994 (the time O'Rourke transferred to Engine 13) could be considered. The district court instructed the jury only to consider Engine 13 evidence and not to consider any of the evidence it had heard about the two years prior to O'Rourke's Engine 13 tenure. Having been successful in its motion to exclude evidence for the period before O'Rourke worked at Engine 13, the City was not permitted to put on evidence in its case relating to pre-Engine 13 incidents. The City had, of course, cross-examined plaintiff's witnesses on this point. The City made no offer of proof.

The jury awarded O'Rourke $275,000 against the City on her hostile work environment sexual harassment claim. The

---

3. Although O'Rourke filed her original court complaint before she filed her EEOC complaint, O'Rourke did receive a right to sue letter and defendants have not argued the point; thus, the point is waived. *See Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393,

102 S.Ct. 1127, 71 L.Ed.2d 234 (1982) ("[F]iling a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling.").

City moved for a new trial. The district court granted the motion on the ground that it had committed a prejudicial error of law by allowing pre-Engine 13 evidence of sexual harassment, and because it believed its curative instruction to the jury was ineffective. The $275,000 verdict was excessive, the court thought, because that sum made it clear that the jury had considered pre-Engine 13 evidence in awarding compensatory damages, despite the court's contrary instruction.

O'Rourke's second trial began in April 1998. The district court limited the evidence to O'Rourke's tenure at Engine 13, from May to December of 1994. Once again, the jury found in favor of O'Rourke, awarding her $200,000 against the City on her hostile work environment claim.

The City again moved for a new trial, which the district court denied. O'Rourke sought an award of attorneys' fees and costs for both trials. The district court awarded O'Rourke $99,685 in attorneys' fees and $10,214.50 in costs for the second trial only; no costs were awarded for the first trial.

The City appeals the district court's denial of its motion for a new trial after the second trial, and O'Rourke seeks on cross-appeal reinstatement of the first jury award, as well as attorneys' fees and costs for the first trial.

### III.

A. O'Rourke's Cross–Appeal to Reinstate Original Verdict

We begin with O'Rourke's cross-appeal from the judgment as a matter of law in favor of defendants at the close of O'Rourke's evidence in the first trial and from the grant of a new trial after the first jury verdict. The district court's power to grant a motion for a new trial is limited to those circumstances in which allowing the verdict to stand would result in a miscarriage of justice. See Velazquez v. Figueroa–Gomez, 996 F.2d 425, 428 (1st Cir. 1993). The appellate court's review is for abuse of discretion. But where, as here, the court's order granting a new trial is based upon a legal conclusion, we review that ruling de novo. See Fleet Nat'l Bank v. Anchor Media Television, Inc., 45 F.3d 546, 552–53 (1st Cir.1995) ("Because the court's order granting [defendants] a new trial was based solely upon its legal conclusions that defective claims had been allowed to go to the jury, we first determine the correctness of the court's rulings in this regard.")

Defendants had filed a motion in limine to exclude all evidence of events before the 300–day charge filing period, arguing that such evidence was barred by the statute of limitations and by Rule 403, Fed.R.Evid. Granting this motion would have meant no evidence could be introduced of the events taking place before September 13, 1994, four months after O'Rourke was assigned to Engine 13.

O'Rourke objected, arguing that the case came within the continuing violation doctrine, an equitable exception to the 300–day filing period, because there was an ongoing pattern of discrimination. See Provencher v. CVS Pharmacy, 145 F.3d 5, 16 (1st Cir.1998). If the doctrine applied, it would have two consequences: O'Rourke could introduce earlier evidence and she could recover damages for earlier conduct. There is a second theory under which earlier evidence was arguably admissible— namely, that even if the continuing violation doctrine did not apply, the evidence was still relevant and probative as to whether the later discrimination took place. See United Air Lines, Inc. v. Evans, 431 U.S. 553, 558, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977). "[S]ometimes time-barred prior incidents become admissible as relevant background evidence." 2 B. Lindemann & P. Grossman, Employment Discrimination Law 1355 (3d ed.1996); see also Morrison v. Carleton Woolen Mills, Inc., 108 F.3d 429, 439 (1st Cir. 1997). But the focus at trial was on admissibility under the continuing violation doctrine, and so we shall focus on it.

The district court denied the motion in limine, stating that it could not make a decision on relevancy in a vacuum. So the pre-September 13, 1994 evidence was allowed in. The City objected to some of the evidence, but not to most of it. Where it made no objections, the City has waived any claim that the evidence was inadmissible. An unsuccessful motion in limine does not preserve an evidentiary objection. See Fusco v. General Motors Corp., 11 F.3d 259, 262 (1st Cir.1993). At the end of the plaintiff's case, defendants moved for judgment, again arguing that evidence of events before September 13, 1994 was inadmissible on statute of limitations and Rule 403 grounds. The plaintiff argued that the continuing violation exception to the statute of limitations applied. The City presented no counter argument in reply and kept hammering a single theme, as though the continuing violation doctrine did not exist.

After dismissing the individual defendants from the case, leaving only the City, the district court held that the pre-charge period evidence was admitted in error because the statute of limitations barred the evidence. Like the City, the district court never explicitly addressed O'Rourke's invocation of the continuing violation doctrine or why it would not apply. That omission was itself error. Indeed, the only reason expressed by the district court in support of its decision was its feeling that O'Rourke had brought these events on herself, see infra note 4, and that therefore the events were irrelevant to her discrimination claim. Insofar as the court thought that to be a reason for applying the statute of limitations, it erred. Indeed, the district court expressed its feeling that plaintiff's case as to pre-Engine 13 events failed on its merits, calling it "all eyewash." Any determination of the merits was for the jury, not the court.

These errors could prove to be harmless if O'Rourke was in fact not entitled to use the continuing violation doctrine. We review de novo a judgment as a matter of law that the continuing violation doctrine does not apply. See Provencher, 145 F.3d at 13; Schultz v. Rhode Island Hosp. Trust Nat'l Bank, N.A., 94 F.3d 721, 726 (1st Cir.1996). Unless there are no material facts in dispute permitting resolution as a matter of law as to whether a continuing violation occurred, it is a jury issue. We reverse a judge's determination "if we determine that a reasonable jury could have found in [plaintiff's] favor." Provencher, 145 F.3d at 13. We conclude that a reasonable jury could have found that O'Rourke was a victim of a continuing violation. See Cambridge Plating Co., Inc. v. Napco, Inc., 85 F.3d 752, 762–63 (1st Cir.1996) (whether discovery rule exception applied); see also Martin v. Nannie and the Newborns, Inc., 3 F.3d 1410, 1415–16 (10th Cir.1993) (reversing grant of summary judgment in sexual harassment case where jury could find plaintiff made out continuing violation).

Before analyzing why a jury could find the continuing violation doctrine applicable, there is an important definition to be emphasized. By its nature, a hostile work environment often means that there are a series of events which mount over time to create such a poisonous atmosphere as to violate the law. In the leading Supreme Court cases, the evidence of harassment covered a period of years. Faragher v. City of Boca Raton, 524 U.S. 775, 782, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (five-year period); Harris v. Forklift Sys., Inc., 510 U.S. 17, 19, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (two and a half years); Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 59–60, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (four years). And so there is a natural affinity between the hostile work environment theory and the continuing violation doctrine. Thus, a court should not hastily dismiss on timeliness grounds a harassment claim where a continuing violation is alleged. Yet the two theories are not the same and not every hostile work environment claim presents a plausible continuing violation. Like the Third Circuit, "we de-

cline to adopt a per se rule that a properly alleged hostile work environment claim also constitutes a continuing violation." *West v. Philadelphia Elec. Co.,* 45 F.3d 744, 755(3d Cir.1995).

We look at whether the defendant's conduct constitutes harassment under Title VII, then determine whether a reasonable jury could have found that there was a continuing violation of Title VII, thus allowing O'Rourke to present evidence of acts before the 300–day filing period. A brief overview of Title VII sexual harassment law is helpful.

### A. Hostile Work Environment

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1) (West 2000). "[T]he very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their race, gender, religion, or national origin offends Title VII's broad rule of workplace equality." *Harris,* 510 U.S. at 22, 114 S.Ct. 367. Courts have long recognized that sexual harassment is "a form of gender discrimination prohibited by Title VII." *Provencher,* 145 F.3d at 13.

■ Title VII sexual harassment law has evolved considerably from its early focus on quid pro quo sexual harassment, where an employee or supervisor uses his or her superior position to extract sexual favors from a subordinate employee, and if denied those favors, retaliates by taking action adversely affecting the subordinate's employment. *See, e.g., Lipsett v. Univ. of Puerto Rico,* 864 F.2d 881, 897 (1st Cir.1988) (collecting cases). Title VII also allows a plaintiff to prove unlawful discrimination by showing that "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the

conditions of the victim's employment and create an abusive working environment.'" *Harris,* 510 U.S. at 21, 114 S.Ct. 367 (citations omitted). Further, Title VII protection is not limited to "economic" or "tangible" discrimination. *Id.*

■ The Supreme Court has outlined the tests a plaintiff must meet to succeed in a hostile work environment claim: (1) that she (or he) is a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established. *See Faragher,* 524 U.S. at 787–89, 118 S.Ct. 2275; *Harris,* 510 U.S. at 20–23, 114 S.Ct. 367; *Meritor,* 477 U.S. at 65–73, 106 S.Ct. 2399. It is undisputed that O'Rourke is a member of a protected class and that she considered defendants' conduct unwelcome; thus, the first two elements of her claim are met. The evidence is compelling that she suffered harassment based on sex. *See Oncale v. Sundowner Offshore Servs.,* 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) ("Courts and juries have found the inference of discrimination easy to draw in most male-female sexual harassment situations, because the challenged conduct typically involves explicit or implicit proposals of sexual activity ..."). We discuss employer liability, the sixth element, a bit later.

■ In hostile environment cases, the fourth and fifth elements are typically the most important. They must be determined by the fact-finder "in light of the record as a whole and the totality of the circumstances." *Meritor,* 477 U.S. at 69, 106 S.Ct. 2399 (internal quotation marks

and citations omitted). Several factors typically should be considered in making this determination: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *See Faragher,* 524 U.S. at 787–88, 118 S.Ct. 2275 (quoting *Harris,* 510 U.S. at 23, 114 S.Ct. 367).

■ As part of its evaluation, a jury may consider a broad range of conduct that can contribute to the creation of a hostile work environment. Indeed, "harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex." *Oncale,* 523 U.S. at 80, 118 S.Ct. 998. Evidence of sexual remarks, innuendoes, ridicule, and intimidation may be sufficient to support a jury verdict for a hostile work environment. *See White v. New Hampshire Dep't of Corrections,* 221 F.3d 254, 260–61 (1st Cir.2000); *cf. Hernandez–Loring v. Universidad Metropolitana,* 233 F.3d 49, 54–56 (1st Cir.2000) (evidence of two specific incidents of harassment in the context of an ongoing pattern of conduct sufficient to survive summary judgment in hostile work environment claim). The accumulated effect of incidents of humiliating, offensive comments directed at women and work-sabotaging pranks, taken together, can constitute a hostile work environment. *Williams v. General Motors Corp.,* 187 F.3d 553, 563–64 (6th Cir.1999).

■ Still, conduct that results from "genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex" does not violate Title VII. *Oncale,* 523 U.S. at 81, 118 S.Ct. 998.

Thus, "offhand comments, and isolated incidents" are not sufficient to create actionable harassment; the hostile work environment standard must be kept "sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" *Faragher,* 524 U.S. at 788, 118 S.Ct. 2275 (quoting *Oncale,* 523 U.S. at 81, 118 S.Ct. 998).

■ Certain comments by the district court[4] lead us to emphasize two other controlling principles. First, sex-based harassment that is not overtly sexual is nonetheless actionable under Title VII, so evidence of that sort may be admissible. "Alleged conduct that is not explicitly racial in nature may, in appropriate circumstances, be considered along with more overtly discriminatory conduct in assessing a Title VII harassment claim." *Landrau–Romero v. Banco Popular De Puerto Rico,* 212 F.3d 607, 614 (1st Cir.2000), (citing *DeGrace v. Rumsfeld,* 614 F.2d 796, 800 (1st Cir.1980) (evidence of equipment sabotage and co-workers' "silent treatment" considered along with racially explicit notes)). That reasoning applies equally to sexual harassment: where a plaintiff endures harassing conduct, although not explicitly sexual in nature, which undermines her ability to succeed at her job, those acts should be considered along with overtly sexually abusive conduct in assessing a hostile work environment claim. *See Lipsett,* 864 F.2d at 905 (conduct that was not explicitly sexual was "nonetheless charged with anti-female animus, and therefore could be found to have contributed significantly to the hostile environment"). As the Eleventh Circuit observed,

"Sexual harassment which creates a hostile or offensive environment for mem-

---

4. For example, the district court characterized O'Rourke's testimony about her treatment after the April 1994 fire as a "red herring." O'Rourke testified she was singled out for discipline and harshly treated by Chief Costa and Lieutenant Cionfolo, involuntarily transferred to another station, and endured harassment as a result of her reputation for

"bailing out" of the fire. This was probative evidence of a hostile work environment. The district court also stated that O'Rourke's testimony demonstrated that she "blames everyone else but herself ... [and] won't accept responsibility for her own conduct." That determination was for the jury.

bers of one sex is every bit the arbitrary barrier to sexual equality at the workplace that racial harassment is to racial equality. Surely, a requirement that a man or woman run a gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living can be as demeaning and disconcerting as the harshest of racial epithets."

*Henson v. City of Dundee*, 682 F.2d 897, 902 (11th Cir.1982).

■ The second principle follows. Courts should avoid disaggregating a hostile work environment claim, dividing conduct into instances of sexually oriented conduct and instances of unequal treatment, then discounting the latter category of conduct. Such an approach defies the *Meritor* Court's directive to consider the totality of circumstances in each case and "rob[s] the incidents of their cumulative effect." *Williams*, 187 F.3d at 561. Moreover, such an approach not only ignores the reality that incidents of nonsexual conduct—such as work sabotage, exclusion, denial of support, and humiliation—can in context contribute to a hostile work environment, it also nullifies the harassing nature of that conduct.[5] An employer might escape liability, even if it knew about certain conduct, if that conduct is isolated from a larger pattern of acts that, as a whole, would constitute an actionable hostile work environment. Thus, employers would lack the incentive to correct behavior that, like more overtly sexual forms of harassment, works against integrating women into the workforce. *See Burlington Indus. v. Ellerth*, 524 U.S. 742, 764, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) (citing Title VII's basic policy of "encouraging forethought by employers"); *cf. Williams*, 187 F.3d at 563 (recognizing as harassment conduct that is not overtly sexual "go[es] to the core of [plaintiff's] enti-

tlement to a workplace free of discriminatory animus").

Statute of limitations problems must be understood in the context of substantive law. The stage set, we turn to the limitations issue.

**B. The Continuing Violation Doctrine**

■ A plaintiff who brings a hostile work environment claim under Title VII must file her claim within 300 days of an act of discrimination, and in general cannot litigate claims based on conduct falling outside of that period. *See Provencher*, 145 F.3d at 13. The limitations period serves to "protect[ ] employers from the burden of defending claims arising from employment decisions that are long past." *Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 47 (1st Cir.1999) (quoting *Delaware State College v. Ricks*, 449 U.S. 250, 256–57, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980)). But where a Title VII violation is "of a continuing nature, the charge of discrimination filed ... may be timely as to all discriminatory acts encompassed by the violation so long as the charge is filed during the life of the violation or within the statutory period." *Pilgrim v. Trustees of Tufts College*, 118 F.3d 864, 868 (1st Cir.1997) (quoting *Kassaye v. Bryant College*, 999 F.2d 603, 606 (1st Cir.1993)). The continuing violation doctrine is an equitable exception that allows an employee to seek damages for otherwise time-barred allegations if they are deemed part of an ongoing series of discriminatory acts and there is "some violation within the statute of limitations period that anchors the earlier claims." *Provencher*, 145 F.3d at 14. This "ensures that these plaintiffs' claims are not foreclosed merely because the plaintiffs needed to see a pattern of repeated acts before they realized that the individual acts were discriminatory." *Thomas*, 183 F.3d at 54.

---

**5.** *See* V. Schultz, *Reconceptualizing Sexual Harassment*, 107 Yale L.J. 1683, 1719–20 (1998) (isolating nonsexual conduct from hostile work environment claim "weakens the plaintiff's case and distorts the law's under-

standing of the hostile work environment by obscuring a full view of the culture and conditions of the workplace" and "drain[s] harassment law of its ability to address the full range of gender-based hostility at work").

Before analyzing whether a jury could find the continuing violation doctrine applicable, there are important definitions of the problem to be emphasized. This is not a case, like *Provencher*, where the problem with application of the doctrine was that there was no discriminatory act within the charge filing period. *See* 145 F.3d at 15–16. The City made no such claim and the district court found there were claimed discriminatory acts in the Engine 13 era. This is also not a case of claimed continuing effects from earlier discriminatory policies, as in *United Air Lines, Inc. v. Evans*. *See* 431 U.S. at 558, 97 S.Ct. 1885. Nor is this a case of a claimed systemic violation under the continuing violation doctrine, where an employer maintains a discriminatory policy that is responsible for multiple discriminatory acts that may not fall within the statutory period. *See Provencher*, 145 F.3d at 14. The question is instead whether what O'Rourke claimed fell within the branch of the continuing violation doctrine which courts have called "serial violations."

■ This court has identified several criteria in determining the sufficiency of a serial continuing violation claim, which we summarize here:

1) is the *subject matter* of the discriminatory acts sufficiently similar that there is a substantial relationship between the otherwise untimely acts and the timely acts? *See Marcano–Rivera v. Pueblo Int'l, Inc.*, 232 F.3d 245, 256 (1st Cir.2000); *Sabree v. United Bhd. of Carpenters & Joiners Local No. 33*, 921 F.2d 396, 401 (1st Cir.1990).

2) are the acts isolated and discrete or do they occur with *frequency* or repeti-

tively or continuously? *See Provencher*, 145 F.3d at 14.

3) are the acts of *sufficient permanence* that they should trigger an awareness of the need to assert one's rights? *See Jensen v. Frank*, 912 F.2d 517, 523 (1st Cir.1990); *Sabree*, 921 F.2d at 402.

Allowing for variations in language, this is essentially the test first articulated by the Fifth Circuit in *Berry v. Board of Supervisors of Louisiana State Univ.*, 715 F.2d 971, 981 (5th Cir.1983), and adopted in a majority of other circuits: *West v. Philadelphia Elec. Co.*, 45 F.3d 744, 755 & n. 9 (3d Cir.1995); *Mascheroni v. Bd. of Regents of Univ. of Cal.*, 28 F.3d 1554, 1561 (10th Cir.1994); *Selan v. Kiley*, 969 F.2d 560, 565–66 (7th Cir.1992); *Bell v. Chesapeake & Ohio Ry. Co.*, 929 F.2d 220, 223–25 (6th Cir.1991); *Roberts v. Gadsden Mem. Hosp.*, 835 F.2d 793, 800 (11th Cir. 1988).[6] Other circuits, while not expressly adopting the *Berry* court's test, employ similar standards to determine whether the continuing violation doctrine applies. *See, e.g., Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 713 (2d Cir.1996) (instances of discrimination must be "specific and related" and plaintiff must be without notice of discriminatory nature of events when they occur); *Curry v. District of Columbia*, 195 F.3d 654, 661 n. 14 (D.C.Cir.1999) (mentioning approaches taken by other circuits but rejecting plaintiff's continuing violation claim because conduct alleged not sufficiently similar).

■ The first two criteria are easily met on this record. The only arguable issue is whether plaintiff produced sufficient evidence on the third criterion, which goes to whether the earlier acts were sufficient to put O'Rourke on notice that she

---

**6.** As best we can tell, only the Ninth Circuit has taken a different position. In *Fielder v. UAL Corp.*, 218 F.3d 973 (9th Cir.2000), the court rejected a *Berry*-type analysis in hostile work environment cases, preferring to focus simply on whether the "discriminatory acts are related closely enough to constitute a continuing violation." *Id.* at 988. In *Morgan v. Nat'l Railroad Passenger Corp.*, 232 F.3d 1008 (9th Cir.2000), the court went even further and rejected any "notice limitation on the continuing violation" doctrine. *Id.* at 1015. The Ninth Circuit's approach may conflate the question of whether there is an actionable hostile environment with the question of an exception to the 300 day filing requirement. We rejected above such a per se approach.

had a substantial, actionable claim and should have complained earlier. This is not a case where there was a single act of such permanence or import to act as a trigger. *See Sabree*, 921 F.2d at 402 (late claim not excused where plaintiff "admitted that he believed, at every turn, that he was being discriminated against" and there was no substantial relationship between the transfers complained of). Rather, this case raises what may be the most difficult question under the doctrine: whether the sheer volume and repetition of the harassment should, as a matter of law, have led O'Rourke to file a discrimination claim earlier.

It is here that the statute of limitations question overlaps with the substantive law of hostile work environment. It would be anomalous to say that, for statute of limitations purposes, a plaintiff should be on notice that she has a discrimination claim where the substantive law says she does not have such a claim yet. Here, the relevant law makes clear that often a sexual harassment claim will not accrue until after a period of recurring acts of harassment. A plaintiff usually will not have a viable claim of hostile work environment from single acts that are isolated or sporadic or not themselves severe enough to alter the work environment and create an abusive work environment—both from an objective and subjective viewpoint. Or they may not of themselves appear to be discriminatory. But the recurrence of events that do not of themselves appear to be discriminatory may, over time, come to demonstrate both an increasingly difficult environment and that the events lack an innocent explanation. A plaintiff may be "unable to appreciate that he is being discriminated against until he has lived through a series of acts and is thereby able to perceive the overall discriminatory pattern." *Sabree*, 921 F.2d at 402. As the Seventh Circuit has said,

> Sexual harassment serious enough to constitute unlawful discrimination on grounds of sex is often a cumulative process rather than a one time event. In its early stages it may not be diagnosable as sex discrimination, or may not cross the threshold that separates the nonactionable from the actionable, or may not cause sufficient distress to be worth making a federal case out of, or may not have gone on long enough to charge the employer with knowledge and a negligent failure to take effective remedial measures.

*Galloway v. General Motors Serv. Parts Operations*, 78 F.3d 1164, 1166 (7th Cir. 1996) (citations omitted). While sometimes these issues may be resolved as a matter of law, they are often better resolved by juries, with jurors reflecting the lessons from their own life's experiences.

Here, it cannot be said as a matter of law that O'Rourke was on notice that she had to file an EEOC claim before September 13, 1994. O'Rourke's own actions show that in the course of September of 1994, things started to reach a breaking point for her: her health was deteriorating and her brothers' efforts to intervene at the station to protect her had failed. One could reasonably infer that she had not realized there was actionable discrimination until this point. And once O'Rourke was on notice of the harassment, she brought the matter to the City's attention. She sought the assistance of the City's EEO officer. When the EEO officer did nothing, O'Rourke turned to Captain Hiter; when he did nothing, she turned to Chiefs Bennett and Cotter. When the Department, under pressure from the Union, frustrated the investigation by prohibiting Bennett and Cotter from talking to anyone below the level of Chief, it became clear that there would be no recourse for O'Rourke short of filing an EEOC complaint. And she did so promptly. A reasonable jury could easily have found that this case fit within the continuing violation doctrine. And because the evidence was necessary to prove a continuing violation, it was error to exclude it under Rule 403.

The probative value far outweighed any prejudice.

As a result, there was no error in the district court's original decision to admit the pre-Engine 13 evidence and there was error in its later decision to instruct the jury not to consider the evidence. Because the grant of the new trial was based on the later erroneous decision, the order granting the new trial on that basis was in error. What to do about that error requires further analysis. We pause, though, to consider whether the new trial order may be affirmed on the judge's alternate ground.

*Other Grounds*

While not entirely clear, it appears that the trial judge concluded from the size of the verdict, $275,000, that the jury had not followed his instructions to disregard pre-May 1994 conduct, and that defendant had been prejudiced as a result and that this amounted to a miscarriage of justice.

But this conclusion is flawed for two reasons. First, even if the jury did not follow their instructions, such error was not prejudicial because, as we have ruled, the instructions were erroneous: the jury was entitled to consider the pre-May 1994 conduct of the defendant. Second, there is no ground to believe that the jury did in fact fail to follow their instructions. The law requires that we assume that the jury followed instructions and only awarded for Engine 13 conduct. *See United States v. Rivera–Gomez,* 67 F.3d 993, 999 (1st Cir. 1995) ("[O]ur system of trial by jury is premised on the assumption that jurors will scrupulously follow the court's instructions."). The gap between a $200,000 award at the second trial, where no pre-Engine 13 evidence was admitted, and a $275,000 verdict at the first trial, does not mean the jury the first time around also awarded for pre-Engine 13 conduct. And

we have no other basis to assume the jury failed to follow instructions.

If, alternatively, the trial judge's ruling was based on the belief that the $275,000 verdict alone warranted setting aside the jury's decision, the ruling was still in error. A jury's award of damages stands unless it is "grossly excessive" or "shocking to the conscience." *Brown v. Freedman Baking Co.,* 810 F.2d 6, 11 (1st Cir.1987). Whether the jury award here can be so characterized depends on what damages plaintiff was entitled to sue for and whether she adequately proved those damages. Compensatory but not punitive damages are available under 42 U.S.C. § 1981a against local governmental agencies.[7] Compensatory damages include "noneconomic injuries, such as emotional distress, pain and suffering, harm to reputation, and other consequential injury, caused by the defendant's unlawful conduct." 2 B. Lindemann & P. Grossman, *Employment Discrimination Law* 1355.

Here plaintiff's injuries were established through her own testimony and that of her treating psychiatrist. O'Rourke testified that while she was at Engine 13, she was a "nervous wreck," often shaking uncontrollably, had difficulty sleeping, and gained weight. Her distress became so severe that she was eventually unable to function. After she took disability leave, O'Rourke continued to suffer from insomnia but spent days in bed and did not want to leave the house. She had severe migraine headaches and gained 80 pounds.

O'Rourke's psychiatrist, Dr. Purvis, testified that in December of 1994, shortly after O'Rourke took leave from the Department, O'Rourke was "clearly depressed" and felt that "her life was falling apart" as a result of the harassment. Dr. Purvis concluded that O'Rourke was disabled and diagnosed her as having post-

---

**7.** While caps limit compensatory (plus punitive) damages awards against employers, the City did not raise the issue. The City of Providence had more than 500 employees over the relevant period. The award of $275,000 thus fell within the $300,000 cap for employers of that size. *See* 42 U.S.C. § 1981a(b)(3)(D).

traumatic stress disorder caused by severe and ongoing stress. He recommended that O'Rourke stay away from the department and continue treatment, including attending regular sessions and taking an anti-depressant. Dr. Purvis also noted that O'Rourke felt tremendous guilt about having filed a complaint because of the impact on her family, particularly her brothers. In mid–1995, as O'Rourke's therapy continued, Dr. Purvis observed that O'Rourke was beginning to grieve because she realized "just how much she lost ... really it was her life." O'Rourke continued to suffer from post-traumatic stress disorder and felt embarrassment and shame. She had a panic attack when she inadvertently encountered a firefighter at a store. Dr. Purvis recommended O'Rourke attend a weight loss clinic after she gained a dramatic amount of weight in a short period of time.

Throughout 1996, O'Rourke's condition remained unchanged. She remained out of work but spoke of her desire to return, although she was fearful. By mid–1997, under Dr. Purvis' guidance, O'Rourke joined the fire prevention department; Dr. Purvis did not think she was able to return to being a line firefighter.

According to Dr. Purvis, O'Rourke continues to suffer from post-traumatic stress disorder, requiring treatment for at least two additional years, including medication and regular sessions. Significantly, Dr. Purvis gave his opinion that O'Rourke's condition was probably permanent:

> [I]t's a very serious condition. The statistics aren't good in terms of a total ... remission of all symptoms. She's been victimized, and that will always be a part of her memory and experiences. It's even felt it entails some basic neurological changes in response to ongoing and repeated stress, so that one's arousal mechanism has permanently changed.

Dr. Purvis described O'Rourke's condition as chronic. O'Rourke continued to treat with Dr. Purvis at the time of her second trial in 1998, and Dr. Purvis testified then that he anticipated O'Rourke would require several more years of treatment.

This evidence amply supports the jury award. The award does not exceed "a rational appraisal of the damages actually incurred." *Hogan v. Bangor & Aroostook R.R.*, 61 F.3d 1034, 1037 (1st Cir.1995). Indeed, in *Hogan*, we found a $200,000 award for compensatory damages in an ADA case to meet this test. *Id.* at 1038 (damages for emotional distress, inconvenience, mental anguish, and loss of enjoyment of life). In *Marcano–Rivera*, we affirmed a jury's verdict of $225,000 in compensatory damages for an employer's failure to accommodate plaintiff's disability. *See* 232 F.3d at 256–57; *see also Webb v. Hyman*, 861 F.Supp. 1094, 1116 (D.D.C.1994) (affirming $225,000 award for emotional distress in sexual harassment case). And in *Koster v. Trans World Airlines, Inc.*, 181 F.3d 24 (1st Cir.), *cert. denied*, 528 U.S. 1021, 120 S.Ct. 532, 145 L.Ed.2d 412 (1999), an age discrimination case, we considered $250,000 an appropriate award of compensatory damages for emotional distress based on plaintiff's testimony that he had trouble sleeping, was anxious, and in his new job worked more and earned less than in his former position, even though "[t]here was no evidence that [plaintiff] ever sought medical treatment or suffered any long-term depression or incapacitation." *Id.* at 36. When compared to these cases, the evidence of O'Rourke's emotional distress supports the $275,000 award: her injury is more severe, is supported by her psychiatrist's testimony, and the consequences of the injury more lasting. Thus, we cannot say that "the evidence of injury was grossly disproportionate to the award for emotional distress" and therefore the $275,000 award is not excessive as a matter of law. *Id.* at 36.

*Reinstatement of First Verdict*

Nonetheless, the first jury verdict may not be automatically reinstated if the first trial was otherwise fatally flawed as

to the City. The City's main argument is that it was precluded from putting on its version of the pre-Engine 13 events. That is only partly true. The City disputed those events on cross-examination of plaintiff's witnesses, and it introduced evidence of its 1992 sexual harassment policy. What it did not do was put on its own witnesses. That might well be enough to carry the City's argument against reinstatement of the verdict save for one thing: the City did not preserve the argument.

The City failed to make an appropriate offer of proof and so it has waived the argument. *See United States v. Bonneau,* 970 F.2d 929, 933 (1st Cir.1992). Similarly, the City failed to properly object to the introduction of most of the pre-Engine 13 evidence, as it was required to do after an unsuccessful motion in limine, and thus failed to preserve its objection. *See Gill v. Thomas,* 83 F.3d 537, 540 (1st Cir.1996).

■ We touch briefly on two of the City's other arguments. First, there is no merit to the City's argument at the first trial that it was entitled to a jury instruction that the firefighters' conduct should be evaluated in the context of a blue collar environment, as one court has held. *See Gross v. Burggraf Constr. Co.,* 53 F.3d 1531, 1538 (10th Cir.1995) ("[W]e must evaluate [plaintiff's] claim of gender discrimination in the context of a blue collar environment where crude language is commonly used ..."). We decline to adopt such a rule for the same reasons the Sixth Circuit rejected it:

> We do not believe that a woman who chooses to work in the male-dominated trades relinquishes her right to be free from sexual harassment; indeed, we find this reasoning to be illogical, because it means that the more hostile the environment, and the more prevalent the sexism, the more difficult it is for a Title VII plaintiff to prove that sex-based conduct is sufficiently severe or pervasive to constitute a hostile work environment. Surely women working in the trades do

not deserve less protection from the law than women working in a courthouse.

*Williams,* 187 F.3d at 564. As always, regardless of the setting, "[t]he critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Harris,* 510 U.S. at 25, 114 S.Ct. 367 (Ginsburg, J., concurring).

■ We also reject the City's contention that the firefighters' reading of pornography in public spaces of the fire station is protected by the First Amendment, placing the burden on O'Rourke to avoid it if it offended her. The City relies on *Johnson v. County of Los Angeles Fire Dep't,* 865 F.Supp. 1430 (C.D.Cal.1994), where a male firefighter successfully challenged a policy categorically banning the possession and reading of sexually explicit magazines in the fire station. The court held the policy an impermissible content-based regulation because the county failed to offer credible testimony that "mere exposure to the cover of Playboy directly contributes to a sexually harassing atmosphere." *Id.* at 1440. But *Johnson* cannot bear the weight of the City's argument. The *Johnson* court emphasized that the plaintiff was "merely seeking to read and possess Playboy quietly and in private ... [and] not seeking to expose the contents of the magazine to unwitting viewers"; it allowed to stand that portion of the County's policy prohibiting the public display of nude pictures. *Id.* at 1440. In contrast, at Engines 5 and 13, O'Rourke was surrounded by pornographic magazines, sexually explicit movies, and nude pictures displayed, with no way to avoid them. That evidence was probative of the City's knowledge that the proscribed materials existed and relevant to O'Rourke's hostile work environment claim; *Johnson* dealt with a constitutional challenge to the policy itself. Moreover, the fact that the City's sexual harassment policy prohibited the keeping of pornographic materials at stations un-

dercuts the City's argument that it was up to O'Rourke to avoid it.

## Employer's Liability

 The City also argues that the district court erred in instructing the jury that there were two ways the City could be made liable:

> If the harasser is a superior, a supervisory employee, then that alone makes the city liable. If it is a superior officer who harassed her, the city is responsible for that individual's conduct. If it is her coworker, or coworkers, who are guilty of this harassing conduct, then the city is only liable if a superior officer knew, or should have known, of the harassment and failed to take prompt remedial action.

In its brief, the City argues that the court improperly instructed the jury on quid pro quo sexual harassment, for which the employer is strictly liable.[8] But it did not raise that objection after the charge, so our review is for plain error only. *See Diefenbach v. Sheridan Transp.*, 229 F.3d 27, 33 (1st Cir.2000). We find no error in the court's instruction, let alone plain error that "affects substantial rights and which has resulted in a miscarriage of justice or has undermined the integrity of the judicial process." *Drohan v. Vaughn*, 176 F.3d 17, 21 (1st Cir.1999) (internal quotation marks omitted). The "knew or should have known" instruction to hold the city liable for actions of coworkers was correct. *See White*, 221 F.3d at 261. Further, where there is an actionable hostile environment attributable to a supervisor, an employer is subject to vicarious liability to a victimized employee where, as here, it fails to exercise reasonable care to prevent it. *See Faragher*, 524 U.S. at 807, 118

S.Ct. 2275. The City cannot show a miscarriage of justice resulted from the jury's verdict for O'Rourke because there was ample evidence to support the City's vicarious liability for the hostile work environment created by both coworkers and supervisors. *See Negron v. Caleb Brett U.S.A., Inc.*, 212 F.3d 666, 672 (1st Cir. 2000).

## Effect of Faragher

 Nor is there reason to remand the case in light of the Supreme Court's 1998 decision in *Faragher, supra. Faragher* entitles an employer to an affirmative defense if it shows that it exercised reasonable care to prevent and correct harassing behavior and that the employee unreasonably failed to take advantage of available remedies. *See id.*, 524 U.S. at 807–08, 118 S.Ct. 2275. But the evidence shows that the City could not prove an affirmative defense under the *Faragher* standard. The City "made no attempt to keep track of the conduct of supervisors" and further, as demonstrated by the City's insistence at trial that O'Rourke should have followed the chain of command and complained to her supervisor, the City "did not include any assurance that the harassing supervisors could be bypassed in registering complaints." *Id.* at 808, 118 S.Ct. 2275. Thus, as the Supreme Court did in *Faragher*, "we hold as a matter of law that the City could not be found to have exercised reasonable care to prevent the supervisors' harassing conduct." *Id.*

Accordingly, O'Rourke established at the first trial the City's liability for the hostile work environment, the final element of her sexual harassment claim, and so we reinstate the verdict.

---

**8.** Although in its brief the City makes this argument only as to the second trial, the court gave the same instruction at both trials. The City objected to the instruction at the first trial on the ground that the court did not give the City's requested supplemental jury instruction that an employer that fails to make an adequate investigation of a sexual harass-

ment complaint can only be held liable for the hostile work environment created by an employee under a negligence theory of liability if the employer's remedial action is also lacking. That is not the law, and so the court did not err by refusing to give the requested instruction.

## IV.

*Attorneys' Fees and Costs*

■ We review the district court's decision regarding attorneys' fees for abuse of discretion. *See Scarfo v. Cabletron Sys., Inc.,* 54 F.3d 931, 963 (1st Cir.1995) ("An award of fees under Title VII is reviewed primarily under an abuse of discretion standard, and the trial court's range of discretion is particularly broad."). We affirm the award of fees for the second trial and reject both parties' attacks. We also hold that O'Rourke is entitled to fees for both trials and so remand for a determination as to fees for the first trial.

■ First, we reject the City's argument that the district court should not have awarded fees for two plaintiff's attorneys at the second trial. The district court concluded that the use of two attorneys at trial was reasonable in light of the complexity of the litigation and the experience of the City's attorney. *See O'Rourke v. City of Providence,* 77 F.Supp.2d 258, 267 (D.R.I.1999). We agree.

■ Similarly, the district court did not abuse its discretion in basing the attorneys' fee award on two different rates for O'Rourke's attorneys at the second trial. The court concluded that Attorney Andrews, whose trial preparation activities the court viewed as analogous to the role of an "associate," should be compensated at a lower rate ($100 an hour) than Attorney DeMaria (at $200 an hour), the "partner," who did all of the witness questioning and arguments at trial. *See id.* at 267–68. The court acknowledged that some of Andrews' preliminary work, before DeMaria became involved, should be compensated at a higher, "partner," rate. Whether all the remaining pre-trial work is "associate" work is hardly self-evident, but we defer to the trial judge's sense of this unusual case.

■ We also conclude that O'Rourke is entitled to an award of attorneys' fees for the first trial, and not just the second trial, for the same reasons that we reinstate the verdict from the first trial. In its opinion regarding O'Rourke's motion for attorneys' fees after the second trial, the court denied O'Rourke attorneys' fees for the first trial because "her counsel was responsible for the introduction of irrelevant and highly prejudicial evidence that resulted in a voiding of that trial result." 77 F.Supp.2d at 264. That conclusion was in error.

The question is who should pay for the mistake, in the sense of bearing the costs of attorneys' fees for two trials. Because the mistake was not caused by plaintiff, there is no reason to deny fees. *Cf. Gierlinger v. Gleason,* 160 F.3d 858, 878–79 (2d Cir.1998) (finding denial of fees for second trial an abuse of discretion where record did not support finding of misconduct by plaintiff's counsel). We think it more consistent with the policies of Title VII to rest those costs on the losing defendant, whose motion resulted in there being two trials.

The district court's reduction of O'Rourke's requested deposition transcript costs was error for the same reason. The court awarded costs only for the transcripts of those witnesses used at the second trial, which were fewer in number than at the first trial because the second trial was limited to Engine 13 conduct. The cost of deposition transcripts that were necessary at the first trial must be included in the award on remand.

## V.

*Prejudgment Interest*

The district court's award of pre-judgment interest was within the district court's discretion to order make-whole relief, *see Earnhardt v. Puerto Rico,* 744 F.2d 1, 3 (1st Cir.1984) (abuse of discretion standard applies to district court's decision whether to award prejudgment interest in Title VII case), and therefore we reject the City's argument that the award was improper.

## VI.

We *reverse* the district court's judgment as a matter of law and its grant of a new trial after the first trial, direct reinstatement of the first jury award of $275,000, *affirm* the attorneys' fees award for the second trial and the award of prejudgment interest, and *remand* for calculation of an appropriate award of attorneys' fees and costs for the first trial.

*So ordered.*