# United States Court of Appeals
## For the First Circuit

No. 02-1349

MAYRA ROSARIO RIVERA,

Plaintiff, Appellant,

v.

PUERTO RICO AQUEDUCT AND SEWERS AUTHORITY; JOSE IVAN COLON;
BENJAMIN POMALES; PERFECTO OCASIO; JOSE E. NIEVES; PUERTO RICO
SERVICES GROUP CORP.; PROFESSIONAL SERVICES GROUP
OF PUERTO RICO, INC.

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Hector M. Laffitte, U.S. District Judge]

Before

Lynch and Howard, Circuit Judges,
and Shadur,* Senior District Judge.

Bruce J. McGiverin for appellant.
Pedro J. Manzano-Yates, with whom Fiddler, Gonzalez &
Rodriguez, LLP were on brief for appellee Puerto Rico Aqueduct and
Sewers Authority.
Sylvia Roger-Stefani for appellees Jose Ivan Colon; Benjamin
Pomales; Perfecto Ocasio; Jose E. Nieves; Puerto Rico Services
Group Corp.
Rafael J. Vazquez-Gonzalez for appellee Professional Services
Group of Puerto Rico, Inc.

June 9, 2003

*Of the Northern District of Illinois, sitting by designation.

**HOWARD**, **Circuit Judge**.  Plaintiff-appellant Mayra Rosario appeals a district court order granting summary judgment to the Puerto Rico Aqueduct and Sewer Authority ("PRASA"), Professional Services Group ("PSG"), José Iván Colón, Benjamin Pomales, Perfecto Ocasio and José Nieves on her employment discrimination claims. The gravamen of Rosario's complaint was that she was subjected to a hostile work environment because of her religion in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e et seq., 42 U.S.C. § 1983, and Puerto Rico law.  The district court determined that Rosario presented neither viable nor timely Title VII and § 1983 claims, and declined to exercise supplemental jurisdiction over the Commonwealth law claims.  We agree and accordingly affirm.

## I.  Background

We recount the facts in the light most favorable to Rosario.  Preferred Mut. Ins. Co. v. Travelers Cos., 127 F.3d 136, 137 (1st Cir. 1997).

PRASA, a Puerto Rico water utility, hired Rosario in 1979.  Her first few years at PRASA were auspicious:  she competed for, and was awarded, several promotions within the budget department, rising from Budget Technician I to Budget Analyst III. Early into her tenure at PRASA, Rosario became an adherent of charismatic Catholicism, a revival movement within the Catholic church whose members practice an "intense" form of Catholicism.  As

a charismatic Catholic, Rosario's spirituality permeated her life, including her work.

During her first few years at PRASA, Rosario's workplace environment was "calm," but her "interior peace" was disturbed when Lydia Feliciano, and later José Antonio Rivera Bauzó, joined her department. Rosario believed that her tense relations with Feliciano and Rivera stemmed from her outwardly religious outlook and high expectation of others. According to Rosario, her co-workers discussed religion interminably, criticizing the Catholic church and, in turn, Rosario for her ardent religiosity.

In this environment, Colón became Rosario's direct supervisor in 1992. Rosario contended that Colón treated her unfairly: he failed to assign her work, criticized her performance, denied her vacation time, did not offer her computer training, and changed the lock of the door to the office without giving her a new key. Rosario complained to Colón that her co-workers' conduct offended her religious beliefs but he failed to pursue the matter.

According to Rosario, Feliciano was one of the main actors contributing to the hostile work environment in the budget office. Feliciano persistently offended Rosario's belief system. She was tenaciously vulgar, using expletives (some of which were directed at Rosario) regularly. When Rosario complained, Feliciano nicknamed her "Mother Theresa." Rosario also took fault with Feliciano's lax work ethic. She recorded in a notebook Feliciano's

violations of PRASA's regulations. Rosario believed that Feliciano, uncomfortable with Rosario's discipline and religiosity, mistreated her.

Rivera also partook in the persistent provocation of Rosario. Rosario cites several unrelated incidents to make this point: Rivera pounded his fist on her desk yelling at her to get to work on several occasions, made absurd gestures at her, and constantly directed inappropriate comments towards her. On Rosario's birthday, for instance, Rivera gave her a card with a pig wearing a rosary with her birth date emblazoned at the top. Rivera also directed verbal taunts at Rosario including, "You've got to abuse women and hit them hard"; "I am going to smack your face open"; and "You pass your time buying pornographic movies, and later you're climbing the walls." Rivera would make such comments to Rosario in the presence of their co-workers.

Rosario believed that Colón and her co-workers wanted her transferred to another department because of her fervent Catholicism. Indeed, Colón wrote a memorandum to the subdirector of finance in 1994 requesting Rosario's transfer to another office. Rosario points to the fact that Colón had no good grounds for seeking that transfer.

In September 1995, PSG took over PRASA's administrative and maintenance responsibilities. Several months later, in May 1996, Colón met with the budget specialists and advised them that

one budget specialist would be placed within the jurisdiction of PSG because of the administrative shuffle caused by the PSG contract. In July 1996, Rosario received a letter notifying her that, although she would continue in her present position, she was thereafter under the supervision of PSG personnel. Despite this personnel change, Rosario remained in the same office with the same position.

In August 1996, Rosario filed an administrative appeal of her transfer to PSG on the ground that she had seniority over employees who were not transferred. Rosario subsequently met with PRASA's executive director, Benjamin Pomales, and he assured her that, for all practical purposes, PSG was the same as PRASA. Pomales also stated that Colón had informed him that Rosario did not have any work to do in her old position.

Rosario did not believe that her grievances were resolved following her meeting with Pomales. Eventually, on September 19, 1997, she filed a complaint with the Equal Employment Opportunity Commission("EEOC") and the Puerto Rico Department of Labor and Human Resources. Rosario did not make the EEOC complaint part of the record, and so the scope of the complaint is not evidence. The EEOC issued a right-to-sue letter on June 5, 1998.

Meanwhile, in March 1998, Rosario received a letter from José Nieves, PRASA's interim human resources manager, informing her that she was going to be relocated to another floor. After

objecting to this transfer to Nieves, Rosario was moved to a smaller office in the finance area. Along with this physical transition, Rosario assumed the temporary position of "interim supervisor" for the reimbursement area. Her immediate supervisor was Elizabeth Romero. In the initial period following her transfer, Romero failed to assign Rosario work despite Rosario's repeated requests for assignments. Although she finally received work in September 1998, she had neither work nor a computer one year later. Rosario claims that she has suffered severe depression and anxiety because of the harassment at PRASA.

On September 2, 1998, Rosario commenced this action pro se pursuant to Title VII of the Civil Rights Act, 42 U.S.C. § 2000e et seq., and Commonwealth law, asserting claims for discrimination in the workplace against PRASA. Rosario was still employed by PSG when she filed this action. Prior to serving the complaint, Rosario retained counsel and, on December 29, 1998, amended her complaint to add as defendants PSG, Colón, Pomales, Ocasio and Nieves, and to add claims under 42 U.S.C. § 1983. Rosario sought damages, a declaratory judgment and an injunction reinstating her to her former position with PRASA. Rosario subsequently amended the complaint again, charging defendants with religious harassment and discriminatory transfer under Title VII, and an Equal Protection violation under § 1983. The religious discrimination theory advanced was that the defendants had engaged in a scheme of

"spiritual harassment" through mockery, vulgar language, and other offensive conduct contrary to "normally acknowledged civil parameters." Such harassment, Rosario contended, caused her profound mental and moral anguish. She sought damages collectively exceeding three million dollars to compensate her for her emotional distress.

After the defendants unsuccessfully moved to dismiss, PSG, and subsequently PRASA and its officers, sought summary judgment on the grounds that Rosario had not made out a prima facie claim under Title VII, and that some of the conduct in question was time-barred. PRASA also challenged Rosario's § 1983 claim on the ground that Rosario had failed to establish that the discrimination was pursuant to its custom or policy. City of Canton, Ohio v. Harris, 489 U.S. 378, 389 (1989).

In two memoranda and orders, the district court granted the defendants' motions and ordered Rosario to show cause why her § 1983 claim against PSG should not be disposed of on the same ground as her claim against PRASA (based on her failure to establish that a PSG custom or policy violated her constitutional rights). The crux of the court's rulings was that there was no credible allegation that the charged conduct was motivated by religious discrimination. The court stated that the outcome of the case might be different if Rosario had brought a sex-based discrimination claim as "Rivera's comments would be strong evidence

to support such a claim."  The court concluded that Rosario's claim based on the July 1996 transfer was time-barred because Rosario, aware of this adverse employment action, had a duty to contest it within the statutorily prescribed period.

Rosario subsequently moved for reconsideration of the court's order.  She also sought to introduce a claim for sex-based discrimination.  The district court denied the motion and, upon receipt of Rosario's response to the show cause order, awarded summary judgment to PSG on Rosario's § 1983 claim.  The court further dismissed without prejudice Rosario's Commonwealth law claims.  This appeal followed.

## II.  Discussion

Rosario argues that there is sufficient record evidence to support a claim of religious discrimination under Title VII and § 1983.  See Sabree v. United Bhd. of Carpenters and Joiners Local No. 33, 921 F.2d 396, 399 (1st Cir. 1990)("[O]ur review will be most searching in cases, such as this, that turn upon the issue of motive or intent.").  The thrust of her argument, as we understand it, is that she raised a genuine issue of material fact that she was subject to constant harassment in her workplace if not because of religion then because of her values and upright lifestyle (which she maintains is a product of her religion).  Such a proffer, according to Rosario, lays the necessary foundation for her religious discrimination claims under either statute.

Rosario also argues that her claims arising from her July 1996 and March 1998 transfers are not barred on statute of limitations and exhaustion grounds because they were part of a continuing violation. See O'Rourke v. City of Providence, 235 F.3d 713, 730 (1st Cir. 2001) (describing the continuing violation doctrine as an "equitable exception that allows an employee to seek damages for otherwise time-barred allegations if they are deemed part of an ongoing series of discriminatory acts..."). Finally, Rosario challenges the district court's refusal to entertain new evidence and her sexual harassment claim after the entry of partial summary judgment. We first address whether Rosario's claims based on her two transfers are procedurally barred under Title VII, and then turn to the substance of her remaining arguments.

A.   The Discriminatory Transfer Claims Under Title VII

Under Title VII, a plaintiff in a deferral jurisdiction such as Puerto Rico must file a charge with the EEOC within 300 days after "the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1)(2000). Rosario filed her charge with the EEOC on September 19, 1997, more than 300 days after the July 1996 transfer. Rosario argues that her Title VII claim based on this transfer is nonetheless timely under the "continuing violation doctrine," which would allow her to recover for the July 1996 transfer notwithstanding the limitations period if the transfer is sufficiently related to acts alleged in a timely charge.

The "continuing violation doctrine" does not preserve Rosario's claim. The Supreme Court has recently elaborated on the meaning of the term "continuing violation," holding that a discrete discriminatory act transpires <u>only</u> at the time it takes place, even if it was related to acts that were timely filed. <u>National R.R. Passenger Corp</u>. v. <u>Morgan</u>, 536 U.S. 101, 122 S.Ct. 2061, 2073 (2002). "Each discrete discriminatory act starts a new clock for filing charges alleging that act. The charge, therefore, must be filed within the 180- or 300-day time period after the discrete discriminatory act occurred." <u>Morgan</u>, 122 S.Ct. at 2072. The Court made plain that "[d]iscrete acts such as termination, failure to promote, denial of <u>transfer</u> or refusal to hire... constitute[] a separate actionable unlawful employment practice." <u>Id.</u> at 2073 (emphasis added). The July 1996 transfer is therefore a time-barred discrete act. <u>See</u> <u>id.</u>; <u>see</u> <u>also</u> <u>Miller</u> v. <u>N.H. Dep't of Corr.</u>, 296 F.3d 18, 22 (1st Cir. 2002).

The March 1998 transfer is also a discrete act constituting "a separate and actionable unlawful employment practice." <u>Morgan</u>, 122 S.Ct. at 2073. Yet <u>Morgan</u> does not address whether a previously filed EEOC complaint must be amended to encompass subsequent discrete acts in order to render such acts susceptible to judicial review. We have held that a judicial complaint can encompass discrete acts of retaliation "reasonably related and grow[ing] out of the discrimination complained of to

-11-

the agency..." Clockedile v. N.H. Dep't of Corr., 245 F.3d 1, 6 (1st Cir. 2001). But in Clockedile we declined to decide whether a judicial complaint also may encompass non-retaliatory but related discrete acts which took place after the discrimination described in the charge if the plaintiff failed to amend her charge or to file a new one detailing the new acts. Id.

We do not need to decide that question here. The defendants articulated a non-discriminatory reason for the transfer -- the facilitation of the transition to PSG supervision -- and Rosario has not presented any evidence from which a reasonable fact finder could conclude that this explanation is a pretext masking religious discrimination. See, e.g., McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973). Thus, even if we assume arguendo that Rosario was not required to first present the agency with her allegation that the 1998 transfer was discriminatory, Rosario's discrimination claim under Title VII fails insofar as it is based on the 1998 transfer.

B. Title VII and Hostile Work Environment Claims

Rosario next challenges the district court's award of summary judgment on her hostile work environment claim. The court concluded that religious discrimination was not behind the offending conduct because the vast majority of incidents did not contain any religious overtones and that animus could not be inferred from the record. Rosario responds that the question of

whether her overt religious practice was the source of the hostile environment she experienced is a jury issue.  This argument fails.

To make out a viable workplace harassment claim based on religion, the plaintiff must establish that:  (1) she is a member of a protected class; (2) she was subject to uninvited harassment;(3) the offending conduct was because of her religion; (4) the harassment was severe and pervasive; (5) the offending conduct was both objectively and subjectively offensive and (where employer liability is sought); (6) there was a basis for such liability.[1]  O'Rourke, 235 F.3d at 728 (emphasis added); I.B. Lindemann & P. Grossman, Employment Discrimination Law 755-56 (3d ed. 1996).  Here, there is no dispute that Rosario was a member of a protected class.  The defendants also admit that Rosario was subject to uninvited "rude and unprofessional" conduct which we assume was severe and pervasive.  We thus turn to whether there is a genuine issue of material fact as to whether the alleged hostile work environment was because of religion.  On that score, regardless of the evidentiary course the plaintiff charts, she must show that alleged discriminatory conduct was not "merely tinged"

---

[1]  In support of her claim, Rosario recounted a miscellany of incidents of discrimination during the preceding decade.  Such alleged discriminatory acts may be considered as background evidence even if they fall outside the filing period so long as one act supporting the claim occurs within the filing period.  Morgan, 122 S.Ct. at 2072.  Given the litany of harassing acts alleged, we assume arguendo that Rosario satisfies this test.

-13-

with remarks abhorrent to her religion but actually was, in either character or substance, discrimination <u>because</u> <u>of</u> <u>religion</u>. <u>Oncale</u> v. <u>Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 81 (1998).

In arguing that she presented sufficient proof of such causation, Rosario points to her co-workers' repeated allusions to religion and their persistent taunting and portrayal of her as self-righteous. She further contends that the supervisors and, by extension, the employers involved (i.e., Colón, Pomales, Nieves, Ocasio, PSG and PRASA) are liable because they were well aware of her predicament but failed to prevent the discrimination and harassment when it was within their power to do so. Although the record is not clear as to whether and to what extent each employer knew about the several incidents of which Rosario complains, we shall assume that Rosario's employers were aware that her co-workers had engaged in inappropriate conduct and mistreated her. We turn now to the specifics.

Rosario first points out that her co-workers were critical of her faith and spirituality. She states that she was given the nickname "Mother Theresa" by Feliciano, who was a co-worker with less seniority (and not her supervisor). The record makes clear, however, that the nickname was a response to Rosario's scolding of Feliciano for her constant vulgarity. Rosario did not appreciate Feliciano's profanity and she regularly let Feliciano know it. But the evidence simply does not permit an inference that

the tense relations between the two was caused by religious discrimination on the part of Feliciano.

Rosario next complains about a bawdy Christmas carol mentioning her name and sung to her by Rivera (again a co-worker with less seniority). Rosario asserts that the lyrics of the song are offensive to her, given her deep religious convictions. We do not doubt this is so. But the question is not whether a religious person could find the song offensive; it is whether religious animus prompted Rivera to sing it to her. And as with the "Mother Theresa" remark, the record does not permit an affirmative response to this question. The song was characteristic of the office's vulgar and unprofessional environment -- an environment to which all were subjected. But there is a conceptual gap between an environment that is offensive to a person of strong religious sensibilities and an environment that is offensive because of hostility to the religion guiding those sensibilities. Rosario has not provided us with evidence or argument sufficient to bridge that gap.[2]

_____

[2] Of course, conduct need not be explicitly religious to constitute harassment because of religion. Where there is evidence of overtly discriminatory conduct, a court may also consider acts that, on their face, do not support a claim for discriminatory workplace harassment. O'Rourke, 235 F.3d at 729. In context, we have held that subversion, exclusion, and denial of support can be factors supporting a hostile work environment claim. Id. at 730. Our inquiry focuses on whether the offending conduct was discriminatory in form or function.
Rosario cites a patchwork of incidents spanning the latter part of her career at PRASA to buttress her Title VII claim. The

Finally, Rosario complains of a birthday card given to her by Rivera that depicted a pig wearing a rosary next to her birth date.[3] We certainly appreciate why Rosario was upset by the connection made between her and the pig. Rivera relished being provocative and successfully egged Rosario on. This is Rosario's strongest evidence of religion-based discrimination, but it is also evidence equally susceptible of a non-discriminatory intent. As she testified, people in her office took it as a joke, and she remained tranquil and viewed it as making fun of her. While a jury could resolve the issue of intent in her favor, this single incident is insufficient to support the edifice of her harassment claims and insufficient by itself to be actionable. There is also no testimony

_____

core of her argument is that her co-workers pointedly attempted to offend her by swearing and making sacrilegious comments in her presence. Feliciano, in particular, swore constantly and otherwise engaged in lewd and discourteous conduct notwithstanding Rosario's complaints. Rivera, for his part, targeted Rosario with offensive taunts and aggressive conduct ostensibly meant to intimidate her. He stated on more than one occasion that "you had to smack women"; he also accused her of "running around with men," attending gay parades and clogging her toilet. The offending conduct, according to Rosario, was not limited to her co-workers. Her supervisor, Colón, not only failed to quell these outbursts, but he also gave her no work, denied her vacation requests, and requested her transfer to another office. But Rosario must demonstrate a trialworthy issue as to whether this conduct was because of her religion, and she has not done so.

[3] The defendants state that the rosary had nothing to do with religion but rather was derivative of "Rosario." For the purposes of summary judgment, we will assume _arguendo_ that the rosary had religious connotations.

by Rosario that she brought this incident to the attention of management.

The summary judgment record shows that the budget office at PRASA was an unprofessional environment. The workers frequently swore, engaged in horseplay, and were derelict in their work duties. And, as Rosario points out, she was different. Rosario attributes that difference to her religious beliefs.[4] There is no evidence about whether there were other deeply religious people in the office and how they were treated. Rosario's beliefs apparently motivated her to act in certain ways. Rosario was not averse to proselytizing and opining that her way was the right way. She would often chide her co-workers for their obscene language and poor work habits, and frequently documented their infractions of PRASA regulations. Unsurprisingly, this course of conduct provoked them and they responded in ways apparently meant to offend her. Such antics, while deplorable, do not amount to a violation of Title VII. Cf. Wilson v. U.S. West Communications, 58 F.3d 1337, 1342 (8th Cir. 1995) (noting that "Title VII does not require an employer to allow an employee to impose his religious views on others."). A constellation of factors led to the friction between Rosario and her

---

[4] We note that neither the Constitution nor Title VII prohibits honest disagreement about religion in the workplace. Lindemann & Grossman, supra at 248 (noting that commentators and Congress criticized the EEOC's proposed harassment guidelines on religion because they could be interpreted as proscribing employees from discussing religion in the workplace).

co-workers, but no reasonable fact finder could conclude on the basis of the incidents we have described or the general atmosphere in the office that one of these factors was an antipathy towards Rosario's underlying religious convictions.[5]

## C. Section 1983

Rosario next challenges the district court's dismissal of her § 1983 claim. Relying on the two discriminatory transfer and the hostile work environment claims she used in support of her Title VII claim, Rosario posits that PSG and PRASA are liable notwithstanding the fact that, in a § 1983 action, liability does not attach pursuant to a respondeat superior theory.[6] According to Rosario, both entities are liable here because they engaged in a policy and pattern of discrimination by failing to prevent the hostile work environment and by promoting it (e.g., by transferring her to another office with an interim position without any duties).

---

[5] Because this ground is dispositive of Rosario's Title VII claim, we need not address the remaining factors constituting a workplace harassment claim. See supra at 13. Similarly, we do not have to reach the district court's alternative holding that there is no individual liability under Title VII. See Serapion v. Martinez, 119 F.3d 982, 992 (1st Cir. 1997)(declining to "enter th[e] thicket" of determining whether individual liability exists under Title VII).

[6] The parties do not dispute that both PSG and PRASA fall within the definition of municipality under Monell v. Department of Social Services of City of New York, 436 U.S. 658, 690-695 (1978) (negating respondeat superior liability of municipalities under § 1983 for violations of federal civil rights).

Rosario further contends, without any meaningful elaboration, that the "deliberate indifference" of the various supervisors at PRASA (Colón, Nieves, Pomales and Ocasio) to her plight gives rise to an actionable equal protection violation. These arguments fail.

We agree with the district court that any claims against PSG and PRASA must fail because there is no evidence of any policy or custom that could warrant municipal liability. This holding applies with equal force to her claims for injunctive and declaratory relief as "the Supreme Court, in imposing the precondition of an unconstitutional official municipal policy, was directly addressing monetary, declaratory, or *injunctive* relief." Dirrane v. Brookline Police Dep't, 315 F.3d 65, 71 (1st Cir. 2002) (citing Monell, 436 U.S. at 690)(internal quotation marks omitted)(emphasis in original).

Rosario's claim against the individual officers also fails. When a plaintiff attempts to use § 1983 as a parallel remedy to a Title VII claim, the prima facie elements to establish liability are the same under both statutes.[7] Lipsett v. Univ. of Puerto Rico, 864 F.2d 881, 898 (1st Cir. 1988); Morris v. Oldham

---

[7] A plaintiff may assert a concomitant employment discrimination Title VII and § 1983 claim. Alexander v. Gardner-Denver Co., 415 U.S. 36, 48-49 (1974) ("The clear inference is that Title VII was designed to supplement rather than supplant, existing laws and institutions relating to employment discrimination.") Harassment of an employee because of her faith, whatever guise it assumes, may constitute religious discrimination under the Equal Protection Clause of the Fourteenth Amendment.

-19-

County Fiscal Court, 201 F.3d 784, 794 (6th Cir. 2000); Jemmott v. Coughlin, 85 F.3d 61, 67 (2d Cir. 1996) (noting that courts commonly apply Title VII law when analyzing § 1983 equal protection claims). In either case, "the plaintiff must prove that the defendant[s] acted with discriminatory intent." Richardson v. Leeds Police Dep't, 71 F.3d 801, 805 (11th Cir. 1995). The inadequacy of Rosario's Title VII claim establishes the inadequacy of her § 1983 claim.

D.  Motion for Reconsideration

In her motion for reconsideration, Rosario attempted to introduce new evidence and raise an additional claim of sex-based discrimination. The district court rejected Rosario's requests, citing her failure to introduce certain audio recordings and raise the sex-discrimination claim until after the entry of summary judgment. Rosario contends that district court erred in so holding. We disagree.

We review a district court's denial of a motion under Fed. R. Civ. P. 59(e) for abuse of discretion. Once a motion for summary judgment has been allowed, "the district court has substantial discretion in deciding whether to reopen the proceedings in order to allow the unsuccessful party to introduce new material or argue a new theory." Mackin v. City of Boston, 969 F.2d 1273, 1279 (1st Cir. 1992).

-20-

There was no error in the court's decision here to disregard the audio recordings Rosario first _introduced_ in connection with her motion for reconsideration. Rosario suggests that she was not at fault for her evidentiary tardiness: she did not present the audio recordings during the summary judgment stage (or earlier) because she needed to obtain better copies and transcripts and the court refused to grant her more time to do so. In effect, Rosario admits that the evidence she offered for the first time in her motion for reconsideration was neither new nor unavailable at the summary judgment stage. As a result, the district court was not obliged to consider it after the entry of summary judgment. _E.g._, _Aybar_ v. _Crispin-Reyes_, 118 F.3d 10, 16 (1st Cir. 1997) (it is not an abuse of discretion for a district court to deny a motion for reconsideration where the supporting evidence was "neither new nor unavailable at the time the district court entered judgment...").

Rosario next argues that, as the district court itself acknowledged in its opinions, the record might have supported a claim of sex-based discrimination even if not raised in the complaint. The thrust of her argument, as we understand it, is that pleadings should be construed "to do substantial justice." Fed. R. Civ. P. 8(f). Rosario concedes that she failed to explicitly plead a gender-based discrimination claim. She posits, however, that her

-21-

allegation of a hostile work environment embraced the full spectrum of discriminatory conduct, including discrimination based on sex.

We see no reason to disturb the district court's judgment. Plaintiffs should not resort to Rule 59(e) motions to "raise arguments which could, and should, have been made before judgment issued." FDIC v. World Univ., 978 F.2d 10, 16 (1st Cir. 1992) (quoting Harley-Davidson Motor Co., Inc. v. Bank of New England, 897 F.2d 611, 616 (1st Cir. 1990)). Rosario endeavored to make out a new legal argument in her motion for reconsideration without any explanation as to why she had not done so earlier. Under these circumstances, it would not promote "substantial justice" to allow Rosario to raise a new legal claim. Landrau-Romero v. Banco Popular de Puerto Rico, 212 F.3d 607, 612 (1st Cir. 2000) (explaining that a Rule 59(e) motion is inappropriate absent a showing of a manifest error of law or newly discovered evidence).

### III.  Conclusion

Rosario has failed to produce sufficient evidence to withstand a motion for summary judgment on her employment discrimination claims. We therefore **affirm** the district court.