Suzette **ZAMBRANA SANTOS,**
Plaintiff(s)

v.

**BANCO SANTANDER DE P.R.,
et al., Defendant(s).**

**Civil No. 02–2864 (JAG).**

United States District Court,
D. Puerto Rico.

March 30, 2005.

Ricardo Pizarro, San Juan, PR, for Plaintiff.

Juan C. Perez–Otero, Pedro J. Manzano–Yates, Carmen Lucia Rodriguez–Velez, Fiddler Gonzalez & Rodriguez, P.S.C., Hato Rey, PR, for Defendants.

## OPINION AND ORDER

GARCIA–GREGORY, District Judge.

On December 27 2002, Suzette Zambrana–Santos ("Zambrana"), filed this action under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, et seq., alleging sex-based discrimination. Zambrana also invokes supplemental jurisdiction pursuant to Puerto Rico Law 100, 29 P.R. Laws Ann. § 146, et seq., and Puerto Rico Law 69, 29 P.R. Laws Ann. § 1321. On August 5, 2004, defendant Banco Santander ("Santander") filed a Motion for Summary Judgment. (Docket No. 30) On December 7, 2004, Santander's motion and plaintiff's opposition thereto were referred to a Magistrate–Judge for Report and Recommendation. (Docket No. 50)

Pending before the Court are the parties' objections to United States Magistrate–Judge Aida M. Delgado–Colon's Report and Recommendation (Docket Nos. 53, 54), recommending defendants' Motion for Summary Judgment be granted in part and denied in part.(Docket No. 52). After reviewing the Magistrate's findings, as well as parties' timely objections, the Court **ADOPTS** the Report and Recommendation.

## I. Standard of Review

■ A District Court may, on its own motion, refer a pending motion to a U.S. Magistrate–Judge for a Report and Recommendation. *See* 28 U.S.C. § 636(b)(1)(B); Fed.R.Civ.P. 72(b); Local Rule 72(a). Pursuant to Fed.R.Civ.P. 72(b) and Local Rule 72(d), the adversely affected party may contest the Magistrate–Judge's Report and Recommendation by filing written objections "[w]ithin ten days of being served" with a copy of the order. *See* 28 U.S.C. § 636(b)(1). Since defendants have filed timely objections to the Magistrate–Judge's Report and Recommendation, the Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which *specific* objection is made. *See United States v. Raddatz*, 447 U.S. 667, 673, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980); *Lopez v. Chater*, 8 F.Supp.2d 152, 154 (D.P.R.1998).

## II. Factual Background[1]

Plaintiff Suzette Zambrana ("Zambrana") began her employment with Banco Central Hispano on January 1989 as Account Analyst in the Operations Department. Zambrana subsequently became Senior Account Analyst. On or around 1996 there was a merger between Banco Santander and Banco Central Hispano. As a result of the merger in 1996, Zambrana became a Banco Santander employee. Banco Santander honored the seniority of Banco Central's employees, including Zambrana's.

Around 1997 Zambrana occupied the position of Corporate Services Official. Zambrana's duties included, among other things, visits to clients, working with corporate banking, proving specialized services for clients, making presentations and negotiating account analyses to the clients.

---

1. Given that no objections to the factual portion of the Report and Recommendation were filed, the Court, in a de novo review finds that the relevant facts, as found by Magistrate Judge Delgado, are sufficiently supported by the record.

Zambrana's territory, as well as that of other employees assigned to her position, covered all of Puerto Rico.

Guillermo Sanz ("Sanz") was Senior Vice–President in charge of corporate banking, construction, corporate services, institutional and international bamking. Among Zambrana's supervisors at the time were Osvaldo Padilla, Corporate Services Vice–President; Eli Beléndez, Department Director; Carlos Cuevas, Director of Institutional Banking; Nelson Miranda, Corporate Services Vice–President; and Pedro Diaz ("Diaz"), Division Director.

Around the year 2000, the Corporate Services Division, where Zambrana worked, underwent a structural reorganization. While Zambrana was under Padilla's supervision, she visited the office at least once a week because she spent most of her time visiting clients throughout the island. Accordingly, Zambrana had to prepare and submit monthly reports on her performance.

After the 2000 reorganization, Zambrana assisted two Departments: the Corporate Banking and Institutional Banking Divisions. Zambrana began to report to Pedro Diaz in May 2000. Zambrana knew Diaz from the time that they had worked together at Banco Central. Administratively, Zabrana reported to Carlos Cuevas and Pedro Diaz. With respect to her duties or functions, Zambrana reported to Nelson Miranda. Regarding Zambrana's duties in Corporate Banking; she occupied the position of Product Manager and reported directly to Pedro Diaz. She was the only Product Manager in Corporate Services who reported to Pedro Diaz.

The discriminatory acts alleged by Zambrana lasted seven months: from May through December of the year 2000. She describes some of these acts as follows:

During the changes and the restructuring that took place around May 2000, Zambrana went with Nelson Miranda to the new Department to see where her work place would be located. Miranda asked Díaz if he knew that Zambrana was going to that Department and Díaz indicated that he knew and that there was an available office. Miranda told Díaz find an available offices so Zambrana could get settled there. When Zambrana sent all her things to the assigned office, she found that it was occupied by another person, Enrique Guzmán. Zambrana asked Díaz where her things were and he told her they had been place in a cubicle because Diaz he did not want Guzmán to feel bad. Zambrana also stated that Díaz asked her to gather all of Guzmán's belongings and take them to him.

Around the end of June 2000, Zambrana went with Enrique Guzmán to visit a client who was interested in some "lock boxes." During the meeting, Zambrana told the client that she was going to be away on vacation during July but that she would prepare the necessary paperwork and leave it with Enrique Guzmán for processing. While on vacation Zambrana went to the Bank to make a presentation for another client. When Zambrana returned from her vacation, in August 2000, Díaz allegedly told her that it was due to her fault that the "lock box" client had sought and obtained the services and product from a competing bank. Zambrana responded that she had left everything with Guzmán and that the Electronic Banking Division was on notice and waiting to process the paper work. Actually, Sanz told Zambrana that Díaz told him that she was responsible for the situation. At that moment, Zambrana told Sanz that she was confronting problems with Díaz. She told him that she did not know if Díaz did not understood her work. Sanz recommended that Zambrana talk with Díaz and she told

him that she had spoken with Díaz from day one, but that she thought that maybe he was still confused. Zambrana agreed with Sanz that she would try to speak to Díaz once more.

In August 2000, a corporate client contacted Zambrana regarding problems with some checks. When Zambrana discussed the situation with Díaz, he allegedly became furious and told her that she did not have to talk to that client because it was Enrique Guzmán's client. Zambrana told Díaz that she was unaware of Guzmán's relationship with the client company and that the company contacted her because it knew her from Central Hispano and because she knew the company's comptroller.

During August 2000, Zambrana ran into Enrique Guzmán while he was offering a client certain products and services that Zambrana knew the Bank could not provide. After Zambrana talked to Guzmán about the matter, they discussed the situation with Díaz. Zambrana explained to Díaz that in the past she had tried to provide the same products and services that Guzmán offered the client, but that it was not possible. According to Zambrana, Díaz told her "let me talk with someone who knows" ("Déjame hablar con alguien que sepa") and contacted another official. Allegedly, the official confirmed the correctness of what Zambrana told Díaz about the product and the services Guzmán had offered. Admittedly, nothing further happened.

During August 2000, there was another incident regarding certain CD-ROMS that affected several clients. Zambrana prepared a memorandum on the issue and addressed it to Nelson Miranda. She also copied other managers, including Pedro Díaz. Zambrana requested that another CD be made and went to take it to a client in Dorado. On her way to Dorado, Díaz called her and asked where she was.

When Zambrana explained to him where she was, Diaz told her "yes, aha, don't tell me." Zambrana asked Díaz if he called "the boys" ("los muchachos") which, according to plaintiff included Héctor Orta, Juan Boscio, Angel Franco and Enrique Guzmán. According to Zambrana, Díaz told her that he had no need to call them. Díaz allegedly added that he called her because she was "the Casper in the Department." Zambrana told Díaz that she was very sorry. According to Zambrana, "Casper" meant "a ghost," the one that was never in the Department. Zambrana alleges that this was false. According to Zambrana, Díaz did not believe that she was on her way to visit a client, but that he thought that she was "at the beach." According to Zambrana, Héctor Orta, Juan Boscio, Angel Franco and Enrique Guzmán almost never left the office, they were always there and, therefore, Díaz saw them more often. Zambrana went to the office approximately once a week.

Following the "Casper" comment, Díaz required Zambrana to meet with him in his office on Friday, August 25, 2000, at 8:30 AM. Zambrana complied but alerted Díaz of the fact that on the same day she was scheduled to attend the Puerto Rico Manufacturer's Convention in Cerromar. She also told Diaz that she was scheduled to be at the Convention at noon because Miranda had requested so. Díaz agreed, but reminded Zambrana to be in the office at 8:30 AM. Zambrana alleges that she arrived at the office around 7:30 AM and that as of 11:00 AM Díaz had not arrived. Zambrana waited until 11:30 AM before leaving. At that time she left a note on Díaz's desk indicating that she had waited until 11:30 AM, that she had left for the convention, and that if he needed anything, he should call her at her cellular phone. When Zambrana returned to the office on Monday, Díaz asked why she had not been

present at the meeting. She replied that she had left him a note and he replied "how pretty" ("que bonito"), remarked that while she was enjoying the "good life" he was there working hard; that he was the one who should have attended the convention.

According to Zambrana, Díaz told her that there was a lot of work in the office, that the phones were constantly ringing and that the "boys" had to take the calls, something that was not their job. According to Zambrana, it was not her job either to take these calls. Zambrana does not know who were the callers or who were they trying to reach. She assumes that the calls were not for her because she received her calls through her cellular phone.

Around September 2000, Guillermo Sanz told the Corporate Banking Senior Officials—including Héctor Orta, Angel Franco, Enrique Guzmán, Boscio and Pedro Díaz—to coordinate with Zambrana the scheduled visits to clients. After the meeting, Díaz told Zambrana that she was the one who had to coordinate the visits. According to Zambrana, Díaz' instruction was contrary to what Sanz had indicated.

According to Zambrana, she was the only female in the Department, and if one of the other employees, who were all male, said that he had contacted a client, Díaz applauded that effort but, aside from one instance when he congratulated Zambrana, Diaz did not congratulate her again. This single occasion in which she was congratulated occurred when following a meeting at a client's office, Díaz said to Zambrana, "Look, I congratulate you, because you women have an art that with the flirtation you put men in your pockets" (" 'Mira, yo te felicito, ustedes las mujeres tienen un arte que con la conquetería se hechan los hombres en un bosillo' ").

Another incident occurred when Zambrana visited Díaz' office to discuss a projected client list, pursuant to a meeting she had had with Sanz. Zambrana examined the list, realized that there were no television stations in the list and asked Díaz why there were no television stations. Díaz told her that he had not thought about that because he focused on multinational clients. When Zambrana told Díaz that Telemundo was a multinational client, he said that he did not know anyone in the station. Zambrana then informed Díaz that she knew Carmen Jovet. According to Zambrana, Díaz ironically replied "another domineering one" ("Otra jodona más") and stated that now he knew why Zambrana was so domineering.

Around December 2000, Sanz passed by Zambrana's work area and asked her if Díaz had told her about a meeting with the Bank's President on December 7, 2000. Zambrana told him that Díaz never told her about the meeting. Sanz instructed Zambrana to go to the meeting, and explain the status of the Corporate Banking Division. The meeting which was originally scheduled for December 7, 2000, was moved forward to December 6, 2000, and according to Zambrana, no one(including Sanz) told her about the change. Nonetheless, Zambrana found out and attended the meeting. There, Sanz asked her to lend him her computer to make his presentation. Zambrana went to her office to get the computer and saw Díaz who told her that the meeting was not of her concern, that she should stay taking phone calls. Zambrana rejected Diaz's instruction and told him that Sanz was waiting for her, that she was there to get her computer, that since she had been invited to the meeting, she planned and intended to attend the same.

On December 8, 2000, Zambrana received a call from one of the bank

branches regarding a client who required assistance. Zambrana took the client's information and told Díaz about the call. According to Zambrana, Díaz hit the desk and said that no Branch had to call her for anything and that the Branch would now get credit for the client. Zambrana told Díaz that the Branch was not going to get the credit and that she was only telling him because she did not know whom he wanted to handle the matter. Thereafter, Zambrana visited the client with Ivonne who was substituting for another official. They made the presentation and the client signed the contract with the Bank.

Zambrana complained to her superiors regarding the situation with Díaz. According to Zambrana, Miranda knew of all the incidents she was having with Díaz since the very beginning. Also, on November 20, 2000 Zambrana met with Sanz. During the meeting Zambrana told Sanz that Díaz had a problem with women in high positions; that he was underestimating her work; that he told her that whether she met her quota or not was irrelevant because "it wasn't a thousandth part of what the guys ("muchachos") did;" that he requested that she give her job to them because they could do it; and, that what she did was nonsense. During this meeting, Sanz, who was Díaz's supervisor, advised Zambrana to brush aside the problems, because work was like that. Zambrana further told Sanz that Díaz was calling her "Casper," that she had spoken with him, and did not know what else to do.

On December 13, 2000, Zambrana met for the last time with Sanz and told him that she did not know what else to do, that Díaz was a male chauvinist, that the last thing he did was that he wanted to remove her from her desk to give it to a recently hired official, that everything she did was insignificant to him, and that he underestimated her job. Sanz told Zambrana that she had to be a "pesky fly" and seek respect. Zambrana also told Sanz what Díaz had told her about her evaluation and shared some concerns she had regarding certain clients.

On December 14, 2000, Díaz called Zambrana in the morning and asked about the meeting she had had with Sanz. Zambrana told Díaz that she and Sanz had spoken about a report. Díaz asked if she had given Sanz a copy of the report, and Zambrana replied that she had not, that they had merely talked about it. According to Zambrana, Diaz told her that she was ridiculous, that what she was saying was nonsense, that "that is the problem you women have, that you always talk too much" ("[U]stedes las mujeres ese es el problema que tienen que siempre hablar de más").

Following her December 14, 2000 meeting with Díaz, Zambrana felt bad, she was trembling, uncontrolled, and could not breathe, she grabbed her purse and went to see Miranda and told him what had happened. Zambrana claims that on that day, when she went to Human Resources she had a "nervous breakdown." Miranda called the Human Resources Department and told Luis Díaz that they should do something about Pedro Díaz because the situation with him had been going on for a long time, that it was unbearable and that Pedro Díaz was a male chauvinist. When Zambrana arrived at the Human Resources Department she was crying to the point where she could not even speak, and had no control.

At the Human Resources Department, Zambrana met with Lydia Ramos ("Ramos"). In her meeting with Ramos, Zambrana told her about the last incident with Díaz. She told Ramos about what Sanz had told Díaz regarding the copy of the

report, and about her cubicle which Díaz had requested for the new official. During this meeting, Zambrana did not tell Ramos everything that was happening regarding this situation. Reportedly, as alleged by Zambrana, Ramos told her to keep quiet, that she could not listen to what she was talking about and Ramos stood up, refused to listen to her, and left. After Ramos left, Hilda Ortiz, a nurse, came into the office and brought Zambrana orange blossom water ("agua de azahar"), tried to calm her and measured her blood pressure. Zambrana was then referred by Ramos to the Employee Assistance Program, where she met with José Rodríguez, a psychologist. This was the first time that Zambrana went to Human Resources with her allegations.

Effective December 14, 2000, Zambrana began a short-term disability leave. As of December 27, 2001, Zambrana had not returned to work and her employment was terminated on that date as she failed to return to work after her one year of short-term disability leave. The decision to terminate Zambrana was an automatic decision made by the Benefits Division of the Human Resources Department. She sought, and received, Social Security disability benefits, with the Social Security Administration determining that she became disabled on December 14, 2000.

## III. The Magistrate's Findings

After considering the issues before her, Magistrate Delgado concluded that there were issues of material fact that precluded judgment in favor of Santander under Title VII's hostile work environment law. Accordingly, it was recommended that this portion of the summary judgment be denied. The Magistrate, however, found that there were no issues of law or material fact that would preclude judgment in favor of Santander with regard to plaintiff's allegations for disparate treatment for termination of employment allegations under Title VII. Accordingly, the Magistrate recommended that this portion of the summary judgment be granted.[2]

## IV. Objections to the Report and Recommendation

### 1. Santander's objections

Defendant Santander objects to the Magistrate's interpretation of the facts, alleging that they were examined out of context and that therefore, the record is devoid of facts that support a claim for hostile environment. Santander proffers that the facts of this case can be divided in two categories: 1) those related to the way Diaz wanted Zambrana to perform her duties(i.e. no interaction with other departments, more presence at the office, answer phone calls, not going over him to Sanz, and attendance at meetings) and 2) those related to comments uttered by Zambrana. Santander alleges that the incidents in the first category were not gender related, but rather incidents of a supervisor trying to assert authority over an employee. With respect to the category of unwelcome comments, Santander contends that they were not frequent or severe enough to create a hostile work environment as a matter of law.

### A. Title VII Analysis

■ In order to prevail under the rubric of hostile environment, Plaintiff must show that "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or perva-

---

**2.** The Magistrate–Judge recommended the same solution for the issues under Puerto Rico's sex-discrimination counterparts, Law 100 and 69. *See* 29 P.R. Laws Ann. § 146 et seq and 29 P.R. Laws Ann. § 1321 et seq.

sive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *Lipsett v. University of Puerto Rico*, 864 F.2d 881, 888 (1st Cir.1988). The Supreme Court emphasized in *Harris* that a plaintiff must prove, as an element of this claim, that the comments and actions complained of were more than merely offensive, but rather were "severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive." *Id.* at 22, 114 S.Ct. 367.

The Supreme Court has further outlined the elements a plaintiff must meet in order to prevail in a hostile work environment claim: (1) that she (or he) is a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established. *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–89, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *see also O'Rourke v. City of Providence*, 235 F.3d 713, 728 (1st Cir.2001).

■ However, it has been underscored by the Supreme Court that, "offhand comments and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher*, 524 U.S. at 788, 118 S.Ct. 2275. In fact, the standard for establishing a hostile

work environment must be sufficiently demanding so as to ensure that Title VII will not become a general code of civility in the workplace. *Id.* Consequently, courts must "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Id.*

■ Whether an environment is hostile or abusive can be determined only by looking at all the circumstances," which may include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *O'Rourke*, 235 F.3d at 723.

■ With respect to Santander's bifurcation of the facts, the First Circuit has held that Courts should avoid desegregating a hostile work environment claim, dividing conduct into instances of sexually oriented conduct (or in this case discriminatory conduct because of gender) and instances of unequal treatment, then discounting the latter category of conduct. *O'Rourke* 235 F.3d at 730. Moreover, such an approach not only ignores the reality that incidents of nonsexual conduct—such as work sabotage, exclusion, denial of support, and humiliation—can in context contribute to a hostile work environment, it also nullifies the harassing nature of that conduct. *O'Rourke, Id.* Accordingly, Santander's approach may not be entertained given that it goes against the *Harris* Court's directive to consider the totality of circumstances in hostile work environment cases. 510 U.S. at 23, 114 S.Ct. 367.

■ Upon a *de novo* review of the issues considered by the Magistrate–Judge in her Report and Recommendation, the

Court finds that her recommendation to deny summary judgment with respect to Zambrana's hostile work environment claim is consistent with applicable law. The Court has delved into the rendered facts applying a "totality of the circumstances" approach. The Court then took the evidence in the light most favorable to Zambrana. This exercise generated, yet again, genuine issues of material fact that preclude summary judgment.

This is a close case. However, after considering all the relevant facts under a "totality of circumstances" approach and taking the evidence in the light most favorable to Zambrana, the Court found that there are genuine issues of material fact that preclude judgment at this time. A finder of fact might reasonably infer that given that Zambrana only visited the office approximately once a week (Defs. Uncontested Fact No. 28), the alleged and undisputed incidents were frequent, severe and pervasive enough to create an environment that a reasonable person would find hostile or abusive against his/her gender. A jury might conclude otherwise, but at this moment the Court finds that the plaintiff has met her burden of establishing a trialworthy issue. Accordingly, the Court **ADOPTS** the Report and Recommendation and **DENIES IN PART** Santander's Motion for Summary Judgment.

### 2. Zambrana's Objections

With regard to the issue of the alleged discriminatory termination of Zambrana's employment, Magistrate–Judge Delgado found that there were no issues of material fact that precluded judgment in favor of Santander. Upon assessing Zambrana's "disparate treatment" claim under the familiar *McDonnell Douglas v. Green* burden-shifting framework, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), Magistrate–Judge Delgado found that Santander met its burden of producing a legitimate non-discriminatory reason for the termination (failure to return within the one-year disability leave), but that Zambrana failed to show that the proffered reason for the termination was a pretext for unlawful discrimination.

Zambrana timely submitted objections to Magistrate–Judge Delgado's Report and Recommendation. However, this two-page filing fails to raise a meritorious objection persuasive enough for the Court to depart from Magistrate–Judge Delgado's findings. Zambrana contends that her termination was a direct consequence of the discriminatory treatment to which she was submitted.

■ Upon a *de novo* review of the issue, the Court finds that Santander has met its burden of producing a valid non-discriminatory reason for the employment decision, and that Zambrana simply failed to present any evidence to bolster a pretext allegation. *See Febres v. Challenger Caribbean Corp.*, 214 F.3d 57, 60 (1st Cir. 2000). (where the Court held that it is not sufficient for a plaintiff merely to impugn the veracity of the employer's account, and that "he must elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real motive: discrimination.")

### CONCLUSION

In light of the foregoing, the Court fully **ADOPTS** the Report and Recommendation (Docket No. 52), and accordingly **GRANTS IN PART AND DENIES IN PART** Santander's Motion for Summary Judgment. (Docket Nos. 30). Plaintiff's disparate treatment claims under Title VII and state counterparts are hereby dismissed **with prejudice.**

Partial Judgment shall enter accordingly.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 30th day of March, 2005